**ATCHISON CASTING CORPORATION,**
Plaintiff,

v.

**DOFASCO, INC., Defendant.**

**No. 93–2447–JWL.**

United States District Court,
D. Kansas.

June 30, 1995.

Don M. Bradley, Joseph Rebein, Kelly W. Schemenauer, Daniel L. McClain, M. Kevin Underhill, Shook, Hardy & Bacon, Kansas City, MO, John T. Bullock, Shook, Hardy & Bacon, Overland Park, KS, Stephan M.L. Cohen, Choate, Hall & Stewart, Boston, MA, Charles F. Scott, Tory, Tory, DesLauries & Binnington, Toronto–Dominion Centre Toronto Canada, for Atchison Casting Corp.

Charles W. Hess, Mark A. Jess, Smith, Gill, Fisher & Butts, William G. Levi, Curtis E. Woods, Jan P. Helder, Jr., David S. Ladwig, Timothy J. Kuester, Sonnenschein, Nath & Rosenthal, Kansas City, MO, for Dofasco Inc.

## *MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

### I. INTRODUCTION

This matter is currently before the court on cross-motions for summary judgment (Docs. # 72 & # 78) and on plaintiff's motion to amend to clarify the pretrial order (Doc. # 102). The parties' dispute arises out of the Atchison Casting Corporation's ("Atchison") purchase of certain assets of Dofasco, Inc.'s ("Dofasco") steel foundry in Ontario, Canada. Atchison has sued Dofasco on breach of contract and misrepresentation theories based on Dofasco's actions and representations with respect to the negotiations for the sale of, as well as the subsequent performance of, the parties' contract. Dofasco has in turn counterclaimed on similar theories of breach of an implied covenant of good faith and fair dealing and misrepresentation. For the reasons set forth fully below, both summary judgment motions are granted in part and denied in part and plaintiff's motion to amend is denied.

### II. FACTUAL BACKGROUND

The following facts are uncontroverted for purposes of this motion. The plaintiff, Atchison, manufactures large, complex steel cast-

ings for use in the locomotive, mass transit and other commercial markets out of its principal manufacturing facilities in Atchison Kansas and St. Joseph, Missouri. One of Atchison's most important product lines is locomotive trucks, also known as under carriages, which are the frames that surround and support the wheels, axles, brakes and motors of the locomotive and upon which the body or superstructure rests. Locomotive trucks are manufactured using patterns that create a mold into which molten steel is poured. Ultimately the trucks are machined, painted, fitted with various parts, and shipped to Atchison's customers who make locomotives.

Atchison traditionally has been the leading North American manufacturer of locomotive trucks, supplying three locomotive builders: General Motors (since 1938), General Electric Transportation Division ("GETS") (since 1973) and Morrison Knudsen (since 1993). Locomotive trucks have historically accounted for one-third or more of Atchison's sales. To a lesser extent, Atchison also manufactures mass transit trucks for subway, commuter and passenger rail cars. Atchison averages approximately $64 million in sales each year.

The defendant, Dofasco, is a Canadian corporation located in Hamilton, Ontario that has been in the steel industry since 1912. It owned and operated a foundry there where it manufactured steel castings, including single piece castings for locomotive and mass transit trucks, for the railroad industry. Dofasco's primary focus is the manufacture and sale of flat-rolled steel. The Hamilton foundry operations were only a minor part of the company's overall steel operations in Ontario.

In April of 1992, after having suffered annual losses there for a number of years, Dofasco decided to cease operation of the Hamilton foundry. The decision was made as part of Dofasco's overall business strategy to downsize its steel operations and become more profitable and efficient by concentrating on its core business, the modern portion of its flat-rolled steel operations. Beginning on April 22, 1992, Dofasco made internal and public announcements that it planned to cease operation of the Hamilton foundry in an effort to inform foundry employees and United States and Canadian customers of Dofasco's intent to exit the foundry business.

Shortly after Dofasco announced that it intended to cease its foundry operations, it received inquiries from numerous entities interested in purchasing either selected portions of the foundry assets or the entire foundry. Both Atchison and Naco, Inc. ("Naco") expressed interest in the foundry. Dofasco initially did not consider offers to sell the entire foundry as a "going concern." Dofasco's president at the time, Bill Wallace, was concerned that Dofasco's industry reputation could be tarnished if the foundry was sold as a "going concern" and subsequently failed or if the salaries of Dofasco foundry employees were significantly reduced.

In June of 1992, Atchison wrote to Dofasco and proposed a purchase and sale of a portion of the foundry assets, namely technology, know-how, and related assets for diesel trucks and rapid transit trucks. It offered a purchase price of $2.17 million cash at closing or $1.3 million cash at closing with certain royalty payments for five years (for a total consideration up to $2.8 million). The letter also contained a provision that Dofasco not pursue discussions with other potential buyers for 90 days. In a second proposal dated June 15, 1992, Atchison increased the offer to $2.0 million cash at closing and royalty payments for a period of five years up to $1 million, for total consideration up to $3 million. Atchison's offer was not accepted.

In late June 1992 Dofasco determined it would attempt to sell substantially all the assets of the foundry to a single purchaser. Thereafter, several parties, including Naco and Atchison, signed confidentiality agreements and began reviewing the foundry's operations and assets to determine whether to enter into substantive negotiations to buy the foundry.

As part of this process, Andy Mikalauskas, the manager of the foundry, provided Atchison with various written materials in order for Atchison to evaluate whether to make a proposal. Dofasco provided a projection for the foundry for November 1, 1992 through December 31, 1993 which forecast that the

foundry would earn $4.8 million of pre-tax income during that period.

Naco, Atchison and Racine Steel Castings ("Racine") emerged as the three principal bidders for the foundry. Racine bid $3.5 million, Naco bid roughly $6 million and Atchison bid $10 million for the entire foundry.[1] All bids were subject to due diligence. Upon receipt of the various proposals, Mr. Mikalauskas advised Naco and Racine that their proposals were not competitive and gave them the opportunity to increase their price. The companies were either unable or unwilling to submit higher bids. Naco expressed skepticism that the higher price offered by Atchison would stand after due diligence was completed. In a letter to Mr. Mikalauskas dated August 4, 1992 Naco indicated:

> We are somewhat surprised that our bid is so far below those of other companies. As you know, we have spent more time reviewing your operations and probably understand your business better than any of the other companies ... When the other companies begin to perform their due diligence, they may come to the same conclusion we have reached. We are skeptical that the initial indication of values you have received will hold to the final closing ... We still have a strong interest in Dofasco Steel Foundry and would be pleased to have further discussions with you.

Because Atchison's bid was significantly higher than any other bid, on August 17, 1992, Dofasco entered into a letter of intent with Atchison for substantially all of the foundry assets. The agreement stated that completion of the transaction was subject to, among other things, due diligence by Atchison and that there be no material changes in business or assets. It further provided:

> The foregoing is not intended to be taken as a legally binding offer to purchase the assets ... but simply to record the parties' intentions in this regard and this letter and its acceptance will not create any legal obligations except as provided under "Purchase and Sale Agreement" and "Confidentiality".

After Atchison and Dofasco entered into the letter of intent, Dofasco issued a notice to its foundry employees which stated:

> Both parties are now working towards meeting a target sale closing of no later than October 31, 1992. However, it is important to understand that we are at an early stage in our discussions, and while we are optimistic of achieving a successful conclusion, the sale is not final at this point.

David Belluck, an Atchison director, Mr. Hugh Aiken, the president of Atchison, and an executive staff oversaw the due diligence of the foundry. In late August of 1992, Mr. Belluck and Mr. Aiken met with Mr. Mikalauskas and offered him a position with Atchison if the company was successful in acquiring the foundry. Dofasco was aware of this offer. From August until late September, Atchison conducted extensive due diligence of the Dofasco foundry.

As part of its due diligence inspection, Atchison visited the foundry at various times, as well as some of the foundry's customers. Holland Hitch, a key foundry customer that provided about 20% of all foundry sales in 1992, indicated that it had replaced its production with a French company and could not commit to resume its business with Dofasco. Atchison estimated the foundry would need to invest $1.5 million in capital improvements to keep the Holland Hitch business.

On September 25, 1991, Mr. Belluck faxed Dofasco a letter which indicated that Atchison's due diligence had "identified a number of factors that are different than the assumptions in the initial material" including: a loss of customers and price declines due to shutdown, the lack of potential for manpower savings, the need for additional capital expenditures, the need for additional maintenance, etc. Based on Atchison's due diligence findings, Dofasco's managers prepared a revised projection of the foundry's income. The revised projection was for a pre-tax profit of only $1 million, a 79% reduction in the foundry's predicted profitability.

Around October 1, 1992, Atchison offered Dofasco $2.5 million for the foundry, with an

---

1. Unless otherwise indicated, from this point on all dollar amounts are in Canadian dollars.

additional $1 million conditional upon Atchison being awarded certain business from Amtrak. Dofasco informed Atchison that the offer was "well below" its minimum price to sell the assets and that it was recommended to Dofasco senior management that the offer be rejected. On October 7, 1992, Atchison repeated its earlier offer and indicated a possibility of offering another $1–1.5 million on an "earn out" basis. Dofasco again rejected the proposal and insisted its minimum price was $6.5 million.

On October 13, 1992, after the Atchison and Dofasco foundry sale was not successful, Dofasco issued a press release and advised its foundry supervisors of the status of the transaction, stating that complications developed that could not be resolved, that a mutually acceptable agreement could not be reached and that Atchison withdrew its offer. A notice to supervisors stated that "the foundry will be closed as we had originally stated."

Also on October 13th, Dofasco and Atchison entered into a separate letter agreement providing for an exclusive negotiating arrangement between Atchison and Dofasco until October 23, 1992, limited to "the foundry patterns and related assets owned by Dofasco for the manufacture of diesel locomotive and rapid transit trucks." Atchison eventually offered $2.5 million for certain of the locomotive and rapid transit truck assets. Dofasco accepted the offer, and on October 20, 1992, Atchison and Dofasco signed a "Purchase and Sale Agreement" for the purchase of certain of the Hamilton foundry's locomotive and rapid transit truck assets for $2.5 million ("Atchison Agreement").

Several drafts of the Atchison Agreement were prepared. Some of the drafts contained a paragraph entitled *"Noncompetition,"* which would have prohibited Dofasco from manufacturing or selling steel castings, soliciting any of Dofasco's employees that

Atchison retained to work in the foundry, or interfering with any contractual or business relations of Atchison for a period of five years.[2] No paragraph bearing that title appeared in the final version.

Pertinent portions of the Atchison Agreement state the following:

*Section 4.01. The Assets.* Until risk of loss with respect to the Assets passes to the Buyer pursuant to Section 1.05 of this Agreement, the Seller will (a) keep the Assets in the condition described in the first sentence of Section 2.05, and preserve all rights in and to all of the Assets and (b) give the Buyer and its representatives full access to the Assets upon reasonable notice to the Seller from the Buyer. After the date hereof, the Seller will not make or accept any new orders for castings of the kind which can be made utilizing the Patterns.

*Section 4.03. Confidential Information.* The Seller will use reasonable efforts to obtain from all bidders for any of its assets and all other parties, and to turn over to the Buyer, all confidential and proprietary information and all trade secrets concerning the Assets. If requested by the Buyer, the Seller will use reasonable efforts to enforce the provisions of any confidentiality or similar agreement, and all other similar rights, relating to the Assets for the benefit of the Buyer. The Buyer will reimburse the Seller for all costs incurred by it in connection with actions taken hereunder at the Buyer's request.

*Section 10.04. Successors and Assigns.* This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns; *provided,* that neither this Agreement nor any right hereunder may be assigned by any party without the consent of the other parties hereto, except that Buyer shall have the right without such consent to

---

**2.** A draft dated September 25, 1992 contained the following language:

*Noncompetition.* Seller shall not, directly or indirectly, for a period of five years after the Closing Date, (a) manufacture or sell steel castings or other products of a kind manufactured or sold by the Business on or prior to the Closing Date, (b) solicit any of the employees

of Seller that Buyer retains to work in the Business as of the Closing or induce any of them to terminate their employment with Buyer or (c) interfere with the contractual or business relations of the Buyer and any other person or firm (including any governmental authority).

assign its rights hereunder to any of Buyer's lenders.

*Section 10.5. Entire Agreement; Amendment.* This Agreement embodies the entire agreement of the parties hereto with respect to the subject matter hereof and superseded all prior agreements and letters with respect thereto. This Agreement may be amended, and any provision hereof waived, only in writing signed by the party against whom such amendment or waiver is sought to be enforced.

*Section 10.10. Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of Ontario and the laws of Canada.

Nothing in the Atchison Agreement provides that if Atchison failed to purchase the foundry, or that if Atchison purchased only the locomotive and rapid transit assets, Dofasco would not sell the remaining foundry assets to a third party or an Atchison competitor. Atchison never requested that a term be inserted into the contract which would provide that the Hamilton foundry would be closed if Atchison purchased solely the locomotive and rapid transit truck assets.

After the Atchison Agreement was signed, Dofasco adopted and implemented a plan to shut down the foundry. Pursuant to an October 19, 1992 written memorandum, Dofasco ceased taking new orders for steel castings. The pouring of heats with respect to orders taken prior to October 19th was to be completed by the end of November of 1992 and finishing on those orders was to be completed by the third week in January of 1993. In addition, by written memorandum dated November 9, 1992, Dofasco implemented a plan to shut down, isolate and preserve its foundry equipment. By February 1, 1993, 90% of the operations at the Hamilton foundry had ceased.

During the pendency of Atchison's exclusive negotiating arrangement with Dofasco, other parties expressed interest in or about the possible sale of the foundry. Shortly after the Atchison Agreement closed, Atchison became aware that Naco was interested in purchasing the foundry's remaining assets. Although Dofasco had already shipped to Atchison some of the required assets pursuant to their agreement, Atchison demanded that certain additional assets be shipped.[3] The parties entered into an agreement on January 19, 1993 dealing with this dispute. Atchison contends it received these assets no earlier than April of 1993.

On January 27, 1993, Dofasco and Dominion Castings Limited ("Dominion"), a Canadian corporation established by Naco, entered into an agreement whereby Dofasco agreed to convey the remaining foundry assets to Dominion ("Dominion Agreement"). The agreement provided that certain assets would be sold and transferred to Dominion for a purchase price equal to the sum of: $1,900,-000, an amount equal to 66⅔% of the net cash proceeds realized by Dominion in each month on the sale of finished goods inventory, and an amount equal to 33⅓% of the net cash proceeds realized in each month by Dominion on the sale of the work in process inventory.[4] Closing was to take place on February 15, 1993.

The parties also entered into an "Interim Management Agreement" dated February 1, 1993 in which they agreed that the business operations of the foundry employing the assets would be maintained as nearly as possible as a "going business" and that Dominion would provide Dofasco with management services in order to continue the operations pending closing of the purchase and sale of assets. Dominion subsequently hired several of Dofasco's former foundry employees.

Dofasco currently provides Dominion with certain services, including hydro electric power, steam, coke oven gas, oxygen, nitro-

---

**3.** With regard to shipment, the agreement provided:

> *Section 1.05. Packaging and Shipment of Assets.* Immediately after the signing of this Agreement, the Seller will commence the collection and packaging of the Assets for shipment to the buyer, which collection and pack-

aging shall be diligently pursued and shall be completed by November 30, 1992.

**4.** In 1993, Dofasco received $400,000 from Dominion for the sale of certain work in process and finished goods inventory that were in the foundry at the time Dominion took possession of the property.

gen and bay water. Dofasco employees testified that many of these services are scheduled to cease in October of 1995, and only bay water services are scheduled to continue.

Dofasco has no ownership, joint venture or partnership interest in Dominion or Naco. Dofasco and Dominion have no common officers or directors. Other than Mr. Mikalauskas, who is a shareholder of both Dofasco and Dominion, there are no common shareholders between Dofasco and Naco or Dofasco and Dominion. Dominion was never a division, department or unit of Dofasco. Dofasco and Dominion do not share employees. During Dominion's initial operation of the foundry, Dominion paid Dofasco for the time spent by any of Dofasco's employees who temporarily assisted Dominion. Dofasco has paid Dominion for any castings which it has purchased from Dominion.

The Dominion Agreement did not involve the purchase by Dominion of any shares of Dofasco stock, the assumption by Dominion of any of Dofasco's liabilities other than warranty obligations, or any corporate merger or consolidation. Dofasco did not sell substantially all of its assets, or even substantially all of the foundry assets, to Dominion. Dofasco did not assign or transfer to Dominion the Atchison Agreement or any of Dofasco's rights or obligations under the Atchison Agreement.

It is uncontroverted that the business negotiations between Atchison and Dofasco which resulted in the Atchison Agreement were conducted at arms length. Both Atchison and Dofasco were represented by legal counsel.

Prior to October of 1992, Dofasco and Atchison were the only North American manufacturers of one-piece cast locomotive trucks. A company like Dominion, with no experience in the production of locomotive truck castings, could not reasonably be expected to produce Dash–9, AC–44 or other similar truck castings for three to five years from the start of operations. Except for the Hamilton foundry and the Buckeye Foundry in Ohio, the only other facility capable of manufacturing the trucks required by GETS, General Motors and Morrison Knudsen was Atchison's foundry. If Atchison was the only

remaining North American manufacturer of locomotive trucks capable of producing GETS' trucks, Atchison would have been the exclusive truck supplier for GETS' Dash–9 and AC–44 locomotives.

Since its purchase of the remaining foundry assets, Dominion has sold at least 1215 locomotive trucks to GETS. Atchison contends that Dominion's access to various of the foundry assets sold to Atchison enabled Dominion to manufacture and sell these trucks within months of the closing of the Dominion Agreement.

Since February of 1993, Atchison has acquired six foundries, one which was vacant and five as going concerns, for approximately 27.5 million United States dollars. No locomotive trucks ever have been produced at any of these foundries.

## III. LEGAL STANDARDS

■ When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Langley v. Adams County, Colorado,* 987 F.2d 1473, 1476 (10th Cir.1993). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anthony v. United States,* 987 F.2d 670, 672 (10th Cir.1993). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

■ Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific*

*R.R.,* 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

## IV. DISCUSSION

### A. Atchison Casting's Claims

Atchison's claims against Dofasco are in two counts: breach of contract and misrepresentation. Atchison contends that Dofasco breached the Atchison Agreement by: (1) selling the foundry to Dominion without limitation on the manufacture of rail trucks, thereby permitting Dominion, as successor, to manufacture and sell rail trucks in competition with Atchison and in violation of the Atchison Agreement; (2) delaying the shipments of assets to Atchison, thereby providing Dominion access to confidential information relating to the proprietary assets; and (3) selling certain of the assets, such as know-how and processes twice. In addition to breaching these express terms of the contract, Atchison contends in its response to defendant's summary judgment motion that Dofasco breached an implied covenant of good faith by destroying the value of the assets sold to Atchison through its subsequent sale of assets to Dominion.

Atchison also contends that Dofasco intentionally, recklessly, carelessly, or without due care, made misrepresentations of material fact about closing the Hamilton foundry and preserving the value of the assets. Atchison contends Dofasco misrepresented that: (1) it would close the Hamilton foundry by October 31, 1992; (2) neither it nor its successors or assigns would make or accept any new orders for castings of the kind which can be made utilizing the patterns; and (3) it would use reasonable efforts to obtain from all bidders for any of the assets and all other parties all confidential and proprietary information and all trade secrets concerning the assets sold to Atchison, indicating the assets were in fact proprietary and that their value would be preserved. Dofasco has moved for summary judgment on all of plaintiff's claims.

### 1. Choice of Law

As an initial matter, the court must determine what law applies to plaintiff's claims. A federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Thus, the court must look to Kansas law to determine which state's laws should be applied.

With respect to plaintiff's contract claims, the question is easily resolved. The parties agree that pursuant to the choice-of-law provision in the Atchison Agreement, Ontario or Canadian law applies. The court is bound to apply the forum state's rule as to whether a contractual choice-of-law provision is enforceable. *Equifax Servs., Inc. v. Hitz,* 905 F.2d 1355, 1360 (10th Cir.1990). Kansas courts have in the past permitted choice of law provisions to control and the court sees no reason why Kansas would not give effect to the provision of the Atchison Agreement under the circumstances of this case. *See id.* (applied Kansas law as agreed to by the parties in their contract); *O.V. Marketing Assoc., Inc. v. Carter,* 766 F.Supp. 960, 964 (D.Kan.1991); *Ritchie Enter. v. Honeywell Bull, Inc.,* 730 F.Supp. 1041, 1046 (D.Kan. 1990) (citing *National Equip. Rental, Ltd. v. Taylor,* 225 Kan. 58, 587 P.2d 870 (Kan.1978)) (Kansas recognizes parties' agreement for the law of another state to govern their rights and duties so long as the transaction at issue has "a reasonable relation" to that state).

With respect to plaintiff's tort claims, Kansas follows the lex loci delicti approach, meaning that the law of the "place of the wrong" controls. *Ling v. Jan's Liquors,* 237 Kan. 629, 634, 703 P.2d 731 (1985). Thus, the law of the state where the tort occurred applies. The "place of the wrong" is that place where the last event necessary to impose liability took place. *Id.* at 634–35, 703 P.2d 731; *see also* Restatement of Conflicts § 377 (1934). In a misrepresentation claim, the "last event" is the injury, so the law of the place of injury applies. *Raymark Indus., Inc. v. Stemple,* 714 F.Supp. 460, 464

(D.Kan.1988). When a person sustains a loss by misrepresentation, "the place of wrong is where the loss is sustained," not where the misrepresentations were made. *Id.* (citing Restatement Of Conflicts § 377 n. 4). The law of the place where the "effects" of a misrepresentation were felt controls. *Seitter v. Schoenfeld,* 678 F.Supp. 831, 836 (D.Kan. 1988).

■ Atchison has its principal place of business in Atchison, Kansas. The damages allegedly suffered are pecuniary damages in the form of lost profits and earnings. The only evidence before the court indicates that these injuries, if suffered at all, were suffered in Atchison, Kansas. That plaintiff lost some customers to Dominion, which is located in Ontario, does not mean plaintiff suffered its losses there. Plaintiff's arguments to the contrary notwithstanding,[5] the court finds that Kansas law and not Ontario law applies to its misrepresentation claims.

### 2. Breach of Covenant of Good Faith and Fair Dealing

In its original motion, Dofasco sought summary judgment on plaintiff's breach of contract claim as set out in the pretrial order which appeared based on three grounds: the selling of the foundry without limit to Dominion, the delay of shipments and concomitant provision of access of confidential information to Dominion, and the alleged selling of certain assets twice. In response, plaintiff denied that summary judgment was warranted and interjected an arguably new breach of contract theory, namely breach of an implied

covenant of good faith and fair dealing. In its reply, defendant contended that plaintiff was barred from raising this theory because it was not contained in the pretrial order and that, in any event, it was entitled to summary judgment on this claim as well. At the court's request, plaintiff then filed a motion to amend or to clarify the pretrial order. The court subsequently held a telephone conference on June 29, 1995 to discuss, among other issues, whether an amendment to the pretrial order was necessary or permissible. After hearing argument, the court ruled that plaintiff's claim of breach of the covenant of good faith and fair dealing was not contained in the pretrial order and, further, refused to permit an amendment to include this legal theory. For the reasons set forth on the record, the court adopts this ruling here.

Even if the court were to permit plaintiff to amend the pretrial order, however, it would grant partial summary judgment in favor of the defendant on this claim. The court finds that plaintiff is not entitled to relief based on an implied covenant of good faith and fair dealing under the circumstances of this case.

■ Canadian law imposes a duty of good faith and fair dealing in the performance of contracts. *LeMesurier v. Andrus* (1986), 54 O.R. (2d) 1, 7 (Ont. C.A.). Under the doctrine, provisions not specifically mentioned in a written contract but which are essential in carrying out its purposes may be implied and found to bind the parties. *Bonanza, Inc. v. McLean,* 242 Kan. 209, 221, 747 P.2d 792, 800 (1987).[6] "A party breaches

---

**5.** Plaintiff, citing *Kansas Municipal Gas Agency v. Vesta Energy Co.,* 840 F.Supp. 814, 822–23 (D.Kan.1993), contends that the law of the place where the misrepresentation was "received" controls. It argues that Ontario law applies because agents of the plaintiff received the misrepresentations in Ontario. Plaintiff's interpretation of this court's ruling in the *KMGA* case is too narrow. In *KMGA,* the place where the injury was suffered was also the place where the misrepresentation was received. The ultimate inquiry focused on the state in which the effects of the misrepresentations were felt. The court's ruling here is consistent with that in *KMGA.* Plaintiff has cited no case departing from the general rule that in a misrepresentation claim, the place of the injury controls. The fact that an agent of the plaintiff received a misrepresentation in Ontario

does not indicate that injuries to the corporation were suffered there.

**6.** The cases cited by the parties dealing with the covenant in Canada seem to be patterned on American law. Thus, United States law on this issue will be considered persuasive. *See, e.g., LeMesurier v. Andrus* (1986), 54 O.R. (2d) 1, 7 (Court stated that approaches by Canadian courts were "an example of the development of an independent doctrine of good faith in contract law at least in the performance of contracts, one explicitly set forth in the American Uniform Commercial Code and in the American Restatement and exhibited, although perhaps in disguised form, in many English and Canadian cases...."); *Grant v. Tiercel Digital ltd.,* [1993] O.J. No. 1158 (Ont. Gen. Div.), *aff'd,* [1994] O.J.

its obligation to act in good faith if, without reasonable justification, the party acts in relation to the contract in a manner which substantially nullifies the bargained for benefits or defeats legitimate expectations of the other party." *Dudka v. Smilestone* (1994), 371 A.P.R. 81, 89 (N.S.S.C.). If it can be seen from the provisions of the contract taken together, that the alleged obligation was within the contemplation of the parties when making their contract, the law will imply and enforce the obligation. *Bonanza,* 242 Kan. at 221, 747 P.2d at 800. It may be fairly said that:

> contracts impose on the parties thereto a duty to do everything necessary to carry them out. When one undertakes to accomplish a certain result he agrees by implication to do everything to accomplish the result intended by the parties ... Moreover, there is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely ... do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

*Id.* at 221, 747 P.2d at 801 (citing 17 Am. Jur.2d, Contracts § 256). However, "essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing." *Id.* Thus, while the covenant regulates the way in which a contract right or duty is exercised, it does not provide a means to add non-bargained-for terms to an agreement.

█ Plaintiff charges that Dofasco's facilitation of competition by Dominion was a breach of the covenant of good faith and fair dealing implied in the Atchison Agreement. In essence plaintiff's theory relies on the proposition that, not only did it purchase the assets relating to the locomotive and rapid transit trucks, but it also purchased the exclusive right to make these trucks for a limited period of time. The theory is also premised on the notion that Dofasco had an obligation to close the foundry and prevent another entity from using the foundry to compete with Atchison. Clearly these rights

and obligations are not expressly set out in the contract. After considering the entire agreement carefully, the court finds that they may not be fairly implied from the agreement either.

The Atchison agreement speaks solely of "the purchase of *certain* assets." (emphasis added). There is nothing in the contract from which one could draw the conclusion that Dofasco had to prevent other entities from competing with Atchison. At best, the contract requires that Dofasco not make the castings which Atchison planned to manufacture using the assets purchased. The contract terms do not prevent the use of assets not purchased for the production of locomotive trucks of the kind which could be made using the Atchison assets. Nor does the contract indicate that the foundry would be closed or that Dofasco refuse to sell the remaining foundry assets to Atchison competitors. There is no indication that Atchison purchased the *exclusive* right to make "castings of the kind which could be made" using the purchased assets or that Dofasco could even confer upon plaintiff such a right.

In the cases cited by the plaintiff under Canadian law, the agreements at issue provided for either an exclusive right or that one party would exercise certain discretion in the performance of a duty. In these cases the covenant of good faith was used to proscribe and determine how the rights and duties of the parties were to be exercised or carried out. By contrast, the plaintiff here does not point to a provision of the Atchison Agreement granting an exclusive right to Atchison or subjecting it to the discretion of Dofasco regarding future competition in the locomotive truck market. The covenant of good faith has not been so liberally applied in Canada to create rights or obligations not already existing in the contract or which cannot fairly be implied from the agreement as a whole and, thus, the court refuses to apply the covenant in such a manner here.

In short, the court finds that there was no mutual manifestation of assent with respect to the rights or obligations plaintiff would have this court imply. Atchison could not

No. 1453 (Ont. C.A.); *Rice v. Rawluk,* (1992), 8 O.R. (3d) 696, 707 (citing *LeMusurier* ).

legitimately have expected these rights or duties to have been covered by the contract it entered into. To permit the covenant of good faith to imply such terms would be to make an end run around the rights and duties which were negotiated and bargained for by the parties and to rewrite the agreement. The negotiators of this agreement were experienced businesspeople with extensive knowledge of the foundry business. Both sides were represented by competent counsel and engaged in extensive negotiations which resulted in various drafts and, ultimately, a completely integrated agreement. Under these circumstances the parties are bound by the contract they signed.

### 3. Breach of Express Terms of the Contract

To the extent that plaintiff claims the selling of the foundry without limit to Dominion, the delay of shipments and concomitant provision of access of confidential information to Dominion, and the alleged selling of certain assets twice, constitute breaches of the express terms of the Atchison Agreement, the court finds that defendant is entitled to partial summary judgment. Partial summary judgment is granted on plaintiff's theory regarding the selling of the foundry without limit to Dominion, but denied as to the delay in shipment and the "selling of the assets twice" theories.

Plaintiff has not met its burden to show a genuine issue of material fact exists with respect to its claim that the selling of the foundry without limit to Dominion "permitt[ed] Naco/Dominion, as a successor, to manufacture and sell rail trucks in competition with Atchison and in violation of the Atchison Agreement." Plaintiff has not shown either that the agreement imposed a duty upon Dofasco to prevent Dominion from competing with Atchison or that Dofasco otherwise had a legal obligation to prevent Dominion from competing. Moreover, the court finds, as a matter of law, that section 4.01 of the agreement is unambiguous and that its clear terms prevent Dofasco from taking new orders, but do not require it to prevent Dominion's competition. The clause simply is not the extensive "noncompetition clause" plaintiff wishes it were.

The Atchison Agreement states that after October 20, 1992, Dofasco "will not make or accept any new orders for castings of the kind which can be made utilizing the Patterns." Plaintiff argues that this provision, in combination with the provision that states that the agreement "shall be binding upon ... the parties and their respective successors and assigns," somehow makes Dofasco liable for Dominion's competition. The combination of these two provisions, however, does not obligate Dofasco to insure that a successor or assign comply with the terms of the Atchison Agreement. Nor does section 4.03 of the agreement require such action on the part of Dofasco. Thus, the agreement, itself, does not require that Dofasco insure Dominion's compliance with its terms. Plaintiff's recourse was to sue Dominion, not Dofasco, if it believed Dominion bound by, and in breach of, the agreement's terms.

In addition, the court finds that Dofasco did not otherwise have a legal obligation to prevent Dominion from making or accepting orders for castings of the kind which could be made utilizing the patterns sold to Atchison and that the law does not impose liability upon Dofasco for the actions of Dominion under the circumstances of this case. Plaintiff relies on the proposition that Dominion is the successor corporation of Dofasco. The court acknowledges that a legal basis exists to hold, under certain limited circumstances, a successor corporation liable for the acts of its predecessor. *See, e.g., Inter–Americas Ins. Corp. v. Xycor Sys., Inc.,* 757 F.Supp. 1213, 1218 (D.Kan.1991). Dofasco, however, is not the alleged successor corporation, but rather is the alleged *predecessor* corporation here. Plaintiff has cited no case in which a predecessor corporation has been held liable for the acts of its successor. Absent any citation to proper authority, the court will not turn theories of successor liability on their head to save plaintiff's claim.

In any event, plaintiff's theory as articulated fails because Dominion is not a "successor" of Dofasco, as that term is used in the contract, as a matter of law. Section 4.10 of the Atchison Agreement employs boil-

erplate contract language to bind "successors and assigns" of Dofasco to the terms of the agreement. In this context, the term "successor" carries with it a legal connotation and generally accepted meaning. With reference to corporations, the term ordinarily means "another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of the first corporation." Black's Law Dictionary 1431 (6th ed. 1990); *see also National Trust v. Mead* (1990), 12 R.P.R. (2d) 165, 177 (S.C.C.) (wherein the Supreme Court of Canada espoused essentially the same definition).

Dofasco and Dominion are separate corporate entities, both of which have continued to conduct separate businesses after the date of the Atchison Agreement. They have separate officers, directors and, with the exception of Mr. Mikalauskas, separate shareholders. Other than certain warranty obligations, Dominion did not assume the liabilities of Dofasco. It did not purchase any stock of Dofasco. Its purchase consisted only of assets which comprised less than four tenths of one percent of Dofasco's total steel making assets in Hamilton, Ontario on a book value basis. Dominion clearly is not Dofasco's "successor" as that term is used in the Atchison Agreement.

■ Finally, the court finds that section 4.01 does not prohibit competition to the extent plaintiff claims. A draft of the Atchison Agreement contained a section titled "Noncompetition" which stated that for a period of five years Dofasco would not "directly or indirectly" manufacture or sell steel castings or other products of a kind manufactured or sold previously. The final agreement, however, which by its terms was fully integrated and superseded all prior agreements, did not contain this language. Had the parties intended the final agreement to prevent Dofasco from "indirectly" competing with Atchison, the parties certainly could have so provided. Plaintiff entered into the Atchison Agreement despite the absence of the "noncompetition" provision of the September draft and agreed that the final document would control. The court will not infer from the existence of the draft that section 4.01 prevents Dofasco from indirectly competing with Atchison.[7] Plaintiff is bound by the language of section 4.01 in the Atchison Agreement.

The question thus becomes what does section 4.01 of the Atchison Agreement prevent Dofasco from doing. The section is titled "The Assets" and prevents Dofasco from making or accepting "new orders for castings of the kind which can be made utilizing the Patterns." The court finds this provision to be clear and unambiguous: it prevents *Dofasco* from making or accepting certain new orders. It does not prohibit *other corporations* from manufacturing this limited group of castings. Dofasco does not contend that it was free to manufacture, after the date of the Atchison Agreement, the locomotive and rapid transit trucks based upon the assets that Atchison purchased. It is uncontroverted that Dofasco, itself, took no new orders for, nor did it compete with Atchison by manufacturing, castings "of the kind" which could be made utilizing the patterns sold to Atchison. Dominion took these actions, not Dofasco, and as the court has already found, there is no basis to treat these companies for purposes of liability as one and the same. Thus, the court finds that Dofasco has not breached the express terms of the contract in this regard.

■ Plaintiff next contends that Dofasco's delay of shipments and concomitant provision of access to confidential information to Dominion breached the Atchison Agreement. On this theory, the court denies summary judgment. The agreement provides that Dofasco would, until the risk of loss with respect to the assets had passed, preserve all of Atchison's rights in and to all of the assets. These assets included all trade secrets, technology, processes, know-how, confidential information and other proprietary property, rights and interests related to the patterns.

---

7. Even if the court were to find that the intended meaning of section 4.01 of the final agreement was the same as that of section 10.11 of the September draft, the court still would not find that the provision was as broad a prohibition on competition as plaintiff contends in order to impose liability of Dofasco.

The agreement further provided that Dofasco would use reasonable efforts to obtain from all parties all confidential and proprietary information concerning the assets and to enforce the provisions of any confidentiality or similar agreement, *and all other similar rights,* relating to the assets for the benefit of the buyer.

The court finds that a genuine issue of material fact exists whether Dofasco breached this aspect of the Atchison agreement. It is uncontroverted that it would take no less than three to five years for a competitor with no prior experience to have developed the technology to make castings of the kind which could be made from the assets purchased by Atchison. There is evidence that Dominion, with no prior experience, was able to produce such rail truck castings within nine months of purchasing the Hamilton foundry. It is uncontroverted that there were delays in the delivery of all of the assets to Atchison, and further, there is evidence which, if credited, could reasonably give rise to the inference that during the period of this delay Dominion had access to proprietary and confidential information, know-how and technology purchased by Atchison. Considering this and other evidence in the light most favorable to plaintiff, the court finds that a genuine fact issue exists and summary judgment should be denied.

Plaintiff's final claim is that Dofasco breached the agreement by selling certain assets such as know-how and processes to Dominion, thus selling the assets twice. Section 1.01(b) of the Atchison Agreement states that Atchison purchased "All ... know-how, confidential information and other proprietary property, rights and interests relating to the Patterns."[8] If Atchison purchased all of these assets, by definition, then, Dofasco could not also sell the assets to Dominion. While the evidence is far from strong that Dofasco literally sold these particular assets twice, the court believes plaintiff has satisfied its burden for purposes of summary judgment. While the Dominion Agreement on its face appears to transfer the rights to assets other than those sold to Atchison, there is sufficient circumstantial evidence that the benefit of the Dominion Agreement, in part, could have included access, even if only for a limited time, to the proprietary information purchased by Atchison.[9] Summary judgment on this issue is denied.[10]

### 4. Fraud and Negligent Misrepresentation Claims

In support of its motion for summary judgment, defendant contends that the represen-

---

8. Plaintiff does not contend that section 1.01(b) is ambiguous or that parol evidence is necessary or should be considered to understand its meaning.

9. In its motion, defendant alleged, as uncontroverted fact number 48, the following:

 Dofasco did not sell or provide to Naco/Dominion or anyone else any of the assets acquired by Atchison. The Agreement between Dofasco and Dominion for Dominion's purchase of the Remaining Assets, dated January 27, 1993 expressly excluded the foundry assets sold to Atchison. Dofasco sold such assets once—to Atchison—not twice.

 The defendant cites in support, among other things, the Dominion Agreement. In response, while plaintiff specifically denied paragraphs 49, 50, 51, and 52, it did not specifically controvert paragraph 48. Defendant argues, quite persuasively, that paragraph 48 was not controverted, that it was thus admitted that Dofasco did not sell the assets twice, and that plaintiff had abandoned its claim.

 While Atchison did not fully comply with the local rule, the court finds that it has not abandoned this claim. Plaintiff's argument and the evidence presented in other areas of its brief indicates that it intended to pursue this claim. There is in fact evidence in the record supporting this claim. While the court cannot definitely explain why the local rule was not followed in this case, the court does not believe dismissal of the claim is warranted under the circumstances.

 It is possible that plaintiff believed Dofasco to be referring to hard assets only and not such intangibles as know-how and processes. The Dominion Agreement cited by Dofasco provided that Dofasco would sell only certain assets to Dominion not including "machinery and equipment" sold to Atchison. As to proprietary information the agreement stated that Dominion would receive items "on hand at the Closing Date." To the extent any claim that Dofasco sold any of the hard assets twice has been made, it shall be dismissed. However, under these circumstances the court will not deem plaintiff to have forfeited its claim regarding know-how and processes.

10. This issue may be revisited at trial upon a Rule 50 motion if circumstances so warrant.

tations that form the basis of plaintiff's tort claims are the very same representations that Atchison points to as the basis for its breach of contract claims and that, as a result, the claims are not actionable under Kansas law. Defendant further contends that because plaintiff seeks purely economic losses and no damages other than damages for breach of contract, dismissal of the misrepresentation claims is warranted. Finally, defendant contends that there is no genuine issue of material fact with respect to plaintiff's misrepresentation claims and summary judgment may be granted as a matter of law. The court finds that plaintiff cannot assert its misrepresentation claims based on either the representation that Dofasco (and its successors or assigns) would not make or accept any new orders for castings of the kind which could be made utilizing the patterns sold, or the representation that Dofasco would use reasonable efforts to obtain from all bidders all confidential and proprietary information and trade secrets of the assets. Plaintiff's fraud claim based on the representation that Dofasco would close the foundry survives summary judgment, but plaintiff's negligence claim based on this representation does not.

Defendant cites *Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22 (10th Cir.1984), and various cases following it, for the proposition that plaintiff's misrepresentation claims are not actionable. *See also Ford Motor Co. v. Suburban Ford*, 237 Kan. 195, 203, 699 P.2d 992, 998, *cert. denied*, 474 U.S. 995, 106 S.Ct. 409, 88 L.Ed.2d 360 (1985); *L.R. Foy Constr. Co. Inc., v. Professional Mechanical Contractors*, 13 Kan.App.2d 188, 194–95, 766 P.2d 196, 201–02 (1988); *Woodmont Corp. v. Rockwood Ctr. Partnership*, 858 F.Supp. 158, 160 (D.Kan.1994); *Smith v. Hawkeye–Security Ins. Co.*, 842 F.Supp. 1373, 1375 (D.Kan. 1994). These various cases hold that the existence of a contractual relationship bars the assertion of tort claims covering the same subject matter governed by the contract. *See, e.g., Smith*, 842 F.Supp. at 1375. They distinguish claims in tort, which arise when a party violates some duty imposed by law, and contractual duties, which are defined by the parties agreement, *see L.R. Foy Constr. Co.*, 13 Kan.App.2d at 194, 766 P.2d at 201, and find that tort duties may not be imposed

where the party's duties and rights are specifically defined by contract. *See Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1200 (10th Cir.1988) (construing *Isler* ); *see also Nature's Share, Inc. v. Kutter Prods., Inc.*, 752 F.Supp. 371, 385 (D.Kan. 1990) ("The point in *Isler* is that a party cannot have a tort duty when the party's same duties and rights are specified by contract."). Where the parties contemplate a remedy in the event of breach, and the provisions of the contract cover the consequences of default, the bargained-for existence of a contractual remedy displaces the imposition of tort duties. *Woodmont Corp. v. Rockwood Center Partnership*, 852 F.Supp. 948, 956 (D.Kan.1994).

The Atchison Agreement specifically required that Dofasco not "make or accept any new orders for castings of the kind which can be made utilizing the Patterns" and that Dofasco "use reasonable efforts to obtain from all bidders for any of its assets and all other parties, and to turn over to the Buyer, all confidential and proprietary information and all trade secrets concerning the Assets." Plaintiff alleges both tort and contract claims based on these specific provisions. Thus, the alleged misrepresentations are the promises made in the contract itself and precisely the same facts allegedly amount to both a tort and a breach of contract. A fair reading of the above-mentioned cases precludes a misrepresentation cause of action when the alleged misrepresentations are essentially terms of the contract itself. Because the contract specifically defined the parties' duties with respect to these matters, extracontractual tort duties regarding these areas are precluded. *Ford Motor Credit Co.*, 237 Kan. at 204, 699 P.2d at 999 (citing *Isler*, 749 F.2d at 23–24). The bargained-for existence of these particular contractual duties displaces the imposition of similar tort duties. *Isler*, 749 F.2d at 24. Thus, defendant is entitled to partial summary judgment on plaintiff's fraud and negligent misrepresentation claims on these theories.

The court finds, however, that plaintiff's fraud claim based on the representation that Dofasco would close the foundry is via-

ble. Plaintiff does not allege a breach of contract claim based on this specific representation. Similarly, the facts supporting this claim are not the same facts alleged to give rise to a breach of contract. Plaintiff states that "[b]y representing that the foundry would be closed, Dofasco induced Atchison to enter into the Atchison Agreement" and contends that it relied on this statement in entering into the agreement. Plaintiff's claim, then, does not relate to the breach of the agreement, but rather is based upon separate facts which, if proved, would establish fraudulent inducement to enter the contract. *Cf. Smith v. MCI Telecommunications Corp.,* 755 F.Supp. 354, 356–57 (D.Kan. 1990) (fraudulent inducement to enter contract constitutes a tort independent of a claim of breach of the same contract). Thus, the court finds that a tortious act is alleged that is sufficiently independent of those acts which are supposed to give rise to breach of contract, pushing this claim beyond the ambit of *Isler* and *Ford Motor Credit Co.*

 This issue is closely intertwined with the general rule in Kansas and elsewhere that punitive damages may not be recovered in a breach of contract action even if the breach is intentional, unless the plaintiff pleads and proves an independent tortious act causing injury. *See Cornwell v. Jespersen,* 238 Kan. 110, 708 P.2d 515, 524 (1985). Indeed, both *Isler* and its progeny and the Kansas cases limiting the availability of punitive damages in breach of contract cases, seem aimed at the same perceived evil: preventing parties from turning what are ordinary breach of contract actions into fraud or other tort claims that open the door to more lucrative awards of damages and in effect allow parties to rewrite the terms of their agreement. *See Heller v. Martin,* 14 Kan.App.2d 48, 54, 782 P.2d 1241, 1245 (1989) (breach of contract action cannot be turned into an action for fraud by merely alleging reliance on representations that the contract would be performed and detriment from its breach) (citing *Brown v. Chaffee,* 612 F.2d 497, 503 (10th Cir.1979)). Defendant contends that Atchison cannot recover on its fraud claim, even as to the representation that Dofasco would close the foundry, because there has been no showing of an independent tort or injury in addition to that claimed for breach of contract.

The court finds *Smith v. MCI Telecommunications Corp.,* 755 F.Supp. 354 (D.Kan. 1990), persuasive on this point. In *Smith,* the plaintiff alleged breach of an employment contract as well as common-law fraud claims. The defendant moved to dismiss arguing that the plaintiff had not pled and could not prove an independent tortious act causing additional injury. *Id.* at 355. The court found that because plaintiff alleged facts which would support a claim for fraud in the inducement, she had alleged a tort independent from her breach of contract claim. The court reasoned that "the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent representation concerning a present, existing intention to perform when such intention is in fact nonexistent" and, after examining the elements of the claim, concluded it was clearly separate from the elements required to prove a claim of breach of contract. The court agrees with the reasoning of *Smith* and finds that plaintiff's claim, that the alleged fraudulent misrepresentation that Dofasco would close the foundry induced plaintiff to enter into the contract, qualifies as an independent tort which states a cause of action under Kansas law.

 The court also finds that a genuine fact issue exists with respect to whether this fraud gave rise to damages in addition to those for breach of contract.[11] It is not clear at this time that plaintiff's claim for breach

---

11. Kansas law provides alternative remedies to a plaintiff who has been fraudulently induced to buy and pay for certain property: it may disaffirm the contract and sue for rescission or affirm the contract and sue for damages. *Whittenburg v. L.J. Holding Co.,* 830 F.Supp. 557, 563 (D.Kan. 1993). Where an action for damages is brought, the purchaser may seek damages equal to the difference between the actual value of the property at the time of the sale and the value it would have had if the representations had been true. *K–B Trucking Co. v. Riss Int'l Corp.,* 763 F.2d 1148, 1159 (10th Cir.1985) (Kansas follows "benefit of the bargain rule"); *Comeau v. Rupp,* 810 F.Supp. 1172, 1177 (D.Kan.1992). Lost profits also may be recovered in a fraud action "where the evidence permits reasonable conclusions about the losses, but not where it is mere speculation." *K–B Trucking,* 763 F.2d at 1160.

based on Dominion's access to confidential information or the alleged selling of certain assets twice will give rise to precisely the same damages as plaintiff's fraud claim and it is possible that plaintiff's damages for fraud in the inducement will differ from those for breach of contract. Moreover, it appears that under Kansas law, a claim for fraud in the inducement is actionable as an independent tort even where actual damages for fraud are duplicative of contract damages. *See Equitable Life Leasing Corp. v. Abbick,* 243 Kan. 513, 516 & Syl. ¶ 2, 757 P.2d 304, 307 (1988) (award of punitive damages proper where fraudulent inducement proven even though award of actual damages on the fraud claim duplicative—no requirement of additional injury); *Smith v. MCI Telecommunications Corp.,* No. 87–2110–O, 1992 WL 88023, at *1 (D.Kan. Mar. 11, 1992). Thus, genuine issues of fact exist with respect to this claim and partial summary judgment is denied as to it.

Concerning plaintiff's negligent misrepresentation claim premised on the alleged misrepresentation that Dofasco would close the foundry, for the reasons stated on the record at the June 29th hearing in this matter, partial summary judgment is granted and the claim dismissed.

### B. Dofasco's Counterclaims

Dofasco asserts two counterclaims against the plaintiff. First, it contends that plaintiff breached a duty to act in good faith and fairly in the negotiation of the Atchison Agreement. Second, it contends that plaintiff committed fraud and fraud in the inducement by misrepresenting, in order to get into an exclusive dealing arrangement with Dofasco, that it intended to purchase substantially all of the assets of the Hamilton Foundry. Plaintiff has sought summary judgment on each claim. The court will address each in turn.

#### 1. Breach of Covenant of Good Faith in Negotiations

Dofasco contends that Atchison, in the course of its negotiations for the assets of the

Hamilton foundry, breached an implied covenant of good faith and fair dealing under Canadian law.[12] It contends that, in a letter of intent, Atchison indicated the basis upon which it was prepared to proceed to purchase substantially all of the assets of the foundry and pledged a purchase price of $10 million. It argues that this letter created binding legal obligations on the parties, including to "instruct counsel to begin preparation of the required Purchase and Sale Agreement so that the transaction," namely the purchase of substantially all of the assets, could "be completed as quickly as possible" and that the parties would "work diligently towards this purpose." Dofasco, in turn, stated that it would deal exclusively with Atchison for a certain period of time. By virtue of these representations, Dofasco contends, the parties owed a duty imposed by law to negotiate in good faith a definitive agreement for the purchase of substantially all the assets for $10 million. Dofasco contends that by pledging that it would purchase substantially all the assets for $10 million when it had no intention to do so, Atchison breached the implied covenant.

 While a good faith covenant has been applied to the performance of contracts, a cause of action for breach of the covenant in the context of *negotiations to contract* has not been explicitly recognized by the Supreme Court of Canada. *See* R.E. Hawkins, *LAC and the Emerging Obligation to Bargain in Good Faith,* 15 Queen's L.J. 65, 88–89 (Fall 1990) ("[A] majority of the [Canadian Supreme] Court has yet to explicitly recognize a cause of action for bargaining in bad faith. When this recognition comes, it will likely sound in tort.... What is needed to achieve this recognition, however, is one more case...."). Lower courts have found that there is no duty to negotiate in good faith generally, "especially where a fundamental or material term of the contract is missing."[13] *Mancha Consultants Ltd. v.*

---

**12.** The parties agree that Canadian law applies to defendant's claim of breach of a covenant of good faith and fair dealing.

**13.** This is consistent with the law of Kansas. Under Kansas law, generally, there is no implied covenant of good faith and fair dealing in negotiations. *Professional Serv. Indus., Inc. v. Kim-*

*Canada Square Dev. Corp.* (1994), 14 B.L.R. (2d) 194. In *Cineplex Corp. v. Viking Rideau Corp.* [1985] O.J. No. 304 (Ont. H.C.), an Ontario court rejected a claim based on a failure to negotiate in good faith stating that, "it is well established in English jurisprudence at least that there is no general duty to bargain in good faith giving rise to a contractual remedy where the contract is not completed by reason of the default of one party or the other." [14] The rule is premised on the notion that a contract to negotiate, like a contract to enter into a contract, is not a contract known to the law:

> "If the law does not recognize a contract to enter into a contract (where there is a fundamental term yet to be agreed) ... it cannot recognize a contract to negotiate. The reason is because it is too uncertain to have any binding force. No court could estimate the damages because no one can tell whether the negotiations would be successful or would fall through; or if successful, what the result would be."

*Courtney & Fairbairn Ltd. v. Tolaini Bros. Ltd.,* [1975] 1 W.L.R. 297, 301 (cited with approval in *Cineplex,* [1985] O.J. No. 304 (Ont. H.C.)).

Dofasco claims that a duty of good faith arose under the letter of intent, citing cases recognizing a duty to bargain in good faith "where the original contract carried an implied term to negotiate in good faith, or where there was a legally binding obligation to negotiate." *See, e.g., Mancha Consultants,* 14 B.L.R. (2d) 194, 204. What precisely is meant by a "legally binding obligation to negotiate" in these cases is unclear. Despite dicta which might be construed more broadly, the cases actually hold an implied covenant exists only in the context of an existing agreement between the parties. For instance, in *Mancha Consultants,* a dispute arose out of a joint venture agreement already formed by the parties. The court recognized an obligation to negotiate the re-

maining terms of the existing agreement in good faith. Similarly, in *Empress Towers, Ltd. v. Bank of Nova Scotia* (1991), 73 D.L.R. (4th) 400, leave to appeal to S.C.C. refused (1991), 79 D.L.R. (4th) vii (note), the court acknowledged the existence of a duty to act in good faith, but only as an extension of a right or obligation in an already existing contract. The remaining cases cited that approve the imposition of a covenant of good faith in negotiations, do so only in dicta, and do not actually afford relief on this basis. *See, e.g., Lakeport Brewing Corp. v. Brewers Retail, Inc.,* [1995] O.R. No. 485 (Ont. H.C.J.).

The court does not believe the letter of intent created sufficient "legal obligations" between the parties from which a covenant of good faith and fair dealing may be implied under Canadian law to afford Dofasco the relief it seeks here. The letter of intent provided that it would, with two limited exceptions, "create no binding obligations" on the parties. The letter did not create binding obligations as to the ultimate purchase of the foundry assets or the purchase price. In fact, it specifically disclaimed any binding obligation to purchase the foundry assets. To the extent this letter of intent created any binding obligations at all, they were limited only to the preparation of the sale and purchase agreement and to the disclosure of confidential information. Dofasco does not seek relief for a breach of an implied covenant of good faith in the exercise or fulfillment of these limited obligations.

It is clear from the letter that the parties did not intend to be bound by the offer made or the purchase price represented and that essential and fundamental terms of the contract had yet to be worked out. To imply a covenant under these circumstances would expand greatly the circumstances under which the Canadian courts have heretofore recognized a covenant of good faith in the bargaining process. Entry into the letter of

---

*brell,* 834 F.Supp. 1305, 1310 (D.Kan.1993); *Columbian Nat'l Title Ins. v. Township Title Serv.,* 659 F.Supp. 796, 806 (D.Kan.1987); *see also* Restatement (Second) of Contracts § 205 cmt. c. (1981).

14. The Court went on to hold, however, that a cause of action could exist for restitution. This is consistent with the Restatement, which notes that although there is no implied contractual duty of good faith in negotiations, remedies for bad faith in the absence of an agreement may be found in the law of torts and restitution.

intent was, in essence, an agreement to agree to a sale of the foundry assets under certain conditions. Presently, such agreements and any covenant of good faith which could arguably be implied therein, are not enforced in Canada. *Cf. Walford v. Miles* [1992], 1 All E.R. 453, 460 (H.L.); *Empress Towers,* 73 D.L.R. (4th) 400. Thus, the court finds that no genuine issues of material fact exist with respect to this counterclaim and partial summary judgment is granted.

### 2. Fraud Claim

In the pretrial order, Dofasco claims that Atchison, by making the bid for substantially all of the assets of the Hamilton foundry, fraudulently induced Dofasco to enter the August 17, 1992 letter of intent and exclusive dealing arrangement causing Dofasco damages. Dofasco contends that Atchison represented that it would purchase substantially all of the assets of the Hamilton foundry under certain conditions when it, in fact, never intended to do so. Plaintiff has moved for summary judgment on the ground that there is no genuine issue of material fact with respect to defendant's fraud claim.[15]

Based on the court's previously-outlined rationale with respect to choice of law issues regarding plaintiff's misrepresentation claim, the court finds that Dofasco's counterclaim for fraudulent misrepresentation is governed by Canadian law. Because the alleged injury relating to defendant's counterclaim for fraudulent misrepresentation occurred in Canada, Canadian tort law applies.

Under Canadian law, a claim for fraudulent misrepresentation is actionable where: (1) the misrepresentation is untrue in fact; (2) it is known by the defendant to be untrue or the defendant is recklessly and consciously ignorant as to its truth; (3) it is intended or calculated to induce the plaintiff to act upon it; and (4) the plaintiff acts upon it and suffers damage. *Francis v. Dingman* (1983), 2 D.L.R. (4th) 244, 261 (Ont. C.A.). The parties agree that, under Canadian law, a representation regarding a future act is actionable if the maker at the time of the representation had no present intent to perform that act. *Datile Financial Corp. v. Royal Trust Corp. of Canada* (1991), 5 O.R. (3d) 358, 377–79 (Ont. Gen. Div.), *varied on other grounds,* (1992) 11 O.R. (3d) 224 (C.A.). A misrepresentation is fraudulent as opposed to merely negligent "when it can be said that its maker has an absence of honest belief in its truth." *Dingman* (1983), 2 D.L.R. (4th) at 253.

■ Plaintiff contends that Dofasco has not met its burden to show that a genuine issue of material fact exists whether Atchison had no present intention to perform when it bid $10 million for the entire foundry. The court disagrees. Dofasco has presented evidence from which a jury could reasonably infer that Atchison's primary intention from the very beginning of negotiations between the two companies was to purchase only the locomotive and rapid transit truck assets and that it bid on all the assets only as a means to that end. In the end, Atchison offered only $2.5 million for assets which it originally estimated were worth $10 million. After the $2.5 million offer for substantially all of the assets was, predictably, rejected, Atchison offered virtually the same amount for only the locomotive and rapid transit truck assets. Viewing this and other evidence in the record in the light most favorable to the defendant, the court finds that a genuine issue of fact exists whether Atchison had a present intent to purchase substantially all of the foundry assets when it entered into the letter of intent and exclusive dealing arrangement with Dofasco.

Plaintiff next contends that, even if a fact issue exists with respect to Atchison's present intent to purchase substantially all of the foundry assets, summary judgment is in any event warranted because Dofasco suffered no damages. The court has thoroughly considered the evidence on the issue of damages and finds that an issue of fact exists whether Dofasco was in fact damaged by plaintiff's alleged fraud. While not overwhelming, there is evidence in the record from which a

---

**15.** Plaintiff seeks summary judgment on claims of fraud and negligent misrepresentation. Dofasco has conceded that its only misrepresentation claim is fraud or fraudulent inducement.

Thus, to the extent defendant concedes it has no claim of negligent misrepresentation, plaintiff's motion for summary judgment is granted.

jury could conclude that the sale of the entire foundry would have generated more revenue than was generated from the piece-meal sale of the foundry assets. Moreover, there is evidence which could give rise to a reasonable inference that plaintiff's fraudulent misrepresentation prevented Dofasco from selling the foundry in its entirety. Under these circumstances, the court believes a genuine issue of fact exists. Plaintiff's motion for summary judgment on defendant's fraud claim is, therefore, denied.

## V. CONCLUSION

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion for summary judgment (Doc. # 72) is granted in part and denied in part consistent with this opinion.

**IT IS FURTHER ORDERED BY THE COURT** that plaintiff's motion for summary judgment (Doc. # 78) is granted in part and denied in part consistent with this opinion.

**IT IS FURTHER ORDERED BY THE COURT** that plaintiff's motion to amend to clarify the pretrial order (Doc. # 102) is denied.

**IT IS SO ORDERED.**