139 F.3d 1080
 35 UCC Rep.Serv.2d 995
 GBJ CORPORATION; Topaz Capital Corporation; Jeffrey J.
Gelmin; and Patrick J. Callanan, Plaintiffs-Appellants,
v.
EASTERN OHIO PAVING COMPANY; Jeffrey Zink; Glenn Straub;
and Fred A. Leistiko, Defendants-Appellees.
 No. 96-4244.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 4, 1998.
Decided March 19, 1998.
 
 James C. Jones (briefed), Charles B. Manuel, Jr. (argued and briefed), Law Office of Charles B. Manuel, Jr., New York City, for Plaintiffs-Appellants.
 Larry A. Zink (argued and briefed), Zink, Zink & Zink Co., Canton, OH, for Defendants-Appellees.
 Before: MERRITT, KENNEDY, and BOGGS, Circuit Judges.
 OPINION
 BOGGS, Circuit Judge.
 
 
 1
 Plaintiffs' claims, stemming from the defendants' alleged improper seizure of a corporation, were dismissed by the district court on summary judgment. G.B.J. Corp. v. Eastern Ohio Paving Co., 950 F.Supp. 816 (N.D.Ohio 1996) [GBJ I ]. The plaintiffs appeal. We affirm in part and reverse in part, and remand this case for further proceedings.
 
 
 2
 * A
 
 
 3
 The plaintiffs are all associated with Lightweight Environmental Products Corp. (LEPCO). Patrick Callanan is (or was) the president and sole stockholder of LEPCO. GBJ and Topaz Capital Corporations hold promissory notes from LEPCO, and GBJ has an option to purchase 25% of LEPCO's stock. Jeffrey Gelmin is the president and sole shareholder of Topaz and GBJ.
 
 
 4
 The defendants are connected to Eastern Ohio Paving Company (EOP). Glenn Straub is the president of EOP, Jeffrey Zink is its counsel, and Fred Leistiko was a consultant and an alleged agent of EOP in the events underlying this case. When distinguishing the individual roles of the defendants is unimportant, the defendants will be referred to as "EOP" or "the defendants."
 
 B
 
 5
 In October 1989, a company called Sequa loaned $700,000 to LEPCO, which secured the loan with the whole of its stock. Eventually, Sequa filed suit against LEPCO for non-payment of this debt and obtained a default judgment for $849,769.
 
 
 6
 In their verified complaint, the plaintiffs offer a detailed version of events--the bulk of which the defendants either contradict or deny--that runs as follows. In 1992, EOP expressed interest in infusing LEPCO with capital and taking control of it, and the two sides began negotiating. At the defendants' request, Callanan negotiated discounted settlements of LEPCO's outstanding debts, which EOP agreed to pay. The keystone of these dealings was EOP's proposed purchase from Sequa of the judgment against LEPCO.
 
 
 7
 On June 8, the plaintiffs allege, the two sides reached a detailed oral agreement, whose terms were as follows:1. Straub and EOP would buy Sequa's judgment against LEPCO for $325,000.
 
 
 8
 2. Straub and EOP would buy promissory notes that LEPCO owed to GBJ, Topaz, and another company, for 50cents on the dollar.
 
 
 9
 3. Once Straub and EOP paid off GBJ's notes, GBJ would give up its LEPCO stock options to Straub and EOP. The options allowed GBJ to buy up to 25% of LEPCO's capital stock.
 
 
 10
 4. Straub and EOP would buy promissory notes that LEPCO owed to Callanan, for their full value.
 
 
 11
 5. Straub and EOP would pay in full LEPCO's Barclays' Bank loan of $44,000.
 
 
 12
 6. Straub and EOP would pay the withholding and property taxes LEPCO owed, as of the date of Straub and EOP's purchase of the Sequa judgment.
 
 
 13
 7. Beyond its payments to buy out LEPCO's notes and pay LEPCO's taxes, Straub and EOP would not have to pay any more than $150,000 total to LEPCO's other creditors.
 
 
 14
 8. Upon payment of the notes, Callanan would surrender 85% of his LEPCO stock to Straub and EOP.
 
 
 15
 9. Leistiko would be LEPCO's national sales manager and would accept $20,000 as a finder's fee for setting up the deal.
 
 
 16
 The plaintiffs allege that the oral agreement was reaffirmed on June 10 and 11, but that it became apparent on June 12 that the defendants had no intention of reducing the agreement to writing. EOP did purchase Sequa's judgment against LEPCO, but did not fulfill the other terms of the alleged agreement. On June 15, the defendants notified Callanan that they were relieving him of his duties and had taken possession of his 100% controlling interest. The plaintiffs claim that once it was in control, EOP sold off many of LEPCO's assets and failed to pay off the promissory notes, at least one of which was personally guaranteed by Callanan, ruining his credit rating. The remaining assets of LEPCO were transferred to a successor corporation, Hazorb, Inc.
 
 
 17
 The defendants' version of events is simpler. They claim that there was no agreement with the plaintiffs. EOP began discussing possible financing for LEPCO in May 1992. Independently, EOP negotiated with Sequa to purchase its judgment against LEPCO for $325,000, and did so on June 9. In return for the $325,000, Sequa gave EOP not just its judgment against LEPCO, but also a full assignment of Sequa's "right, title and interest to any agreements, contracts, stock options, judgments or otherwise" to EOP. The latter assignment thus included Sequa's secured interest in the whole of LEPCO's stock, and since LEPCO was in default on its obligations, the defendants argue, EOP acquired all of LEPCO's stock.
 
 C
 
 18
 The plaintiffs filed their initial complaint in April 1993, in the United States District Court for the Southern District of New York. The case was assigned to Judge Cedarbaum. In March 1994, the plaintiffs applied for a preliminary injunction to prevent the defendants from further dismantling LEPCO, but Judge Cedarbaum denied the motion. In May, Judge Cedarbaum transferred the case to the United States District Court for the Northern District of Ohio, because there was only a weak basis for personal jurisdiction in New York, and a much stronger one in Ohio.
 
 
 19
 In November, the plaintiffs filed an amended verified complaint with lengthy exhibits. The dismissal of this complaint is the subject of this appeal. The complaint set forth five causes of action:
 
 
 20
 1. "Defendant's [sic] Failed to Repay a loan made to LEPCO in the amount of $85,000 with interest thereon due and payable at the rate of 12% per annum under the terms of GBJ's notes."
 
 
 21
 2. The defendants' "Removal of Plaintiff Callanan ...; their fraudulent seizure and control of the company[ ] ...; their operation of LEPCO in a manner which has resulted in the dissipation of its assets and the serious impairment of its good will, name, and reputation in the industry ... [and with] its creditors, note holders, suppliers, and customers all violate the [stockholder agreement] and seriously impair the value of GBJ's option to purchase 25% of the capital stock of LEPCO...."
 
 
 22
 3. "Defendants ... Failed to Repay loans made to LEPCO in the amount of $100,000 under the terms of Callanan's notes."
 
 
 23
 4. "Fraud." The complaint says that the defendants represented that they would enter into the multi-part deal detailed above. These representations, the complaint continues, were a material factor in inducing Callanan to give Sequa a full release. This cleared the way for Sequa to transfer its interest in LEPCO to the defendants, setting in motion the events underlying this lawsuit.
 
 
 24
 5. "Defendants' breach of their implied covenants of good faith and fair dealings proximately caused harm and damages to Plaintiffs."
 
 
 25
 In April 1995, the defendants moved for summary judgment on all claims and attached their own lengthy series of exhibits. They argued that:
 
 
 26
 (1) the first and third causes of actions are barred by the Statute of Frauds;
 
 
 27
 (2) the fourth cause of action fails to state a claim for fraud because, under New York law, allegations that one did not intend to honor a contract, or that one made misrepresentations as to future events, do not state a claim for fraud; and
 
 
 28
 (3) the fifth cause of action fails to state a claim, because the implied covenant of fair dealing is limited to performance under an enforceable contract, and the Statute of Frauds dictates that there is no enforceable contract.
 
 
 29
 The defendants made no argument regarding the second cause of action. In the facts section of their brief in support of summary judgment, though, they stated that the second claim had been decided by Judge Cedarbaum when she denied plaintiffs' motion for a preliminary injunction.
 
 
 30
 The next month, the plaintiffs filed a brief response and one exhibit, a copy of a placemat. The placemat was supposed to represent evidence of the oral agreement--it appears as a series of numbers with no explanation, and with defendant Zink's initials doodled on them. The plaintiffs do not claim that the placemat is itself a written contract.
 
 
 31
 The district court granted the defendants' motion in October 1996. The plaintiffs then filed this timely appeal.
 
 II
 
 32
 The plaintiffs challenge the dismissal of each of the five claims. For the reasons set forth below, we affirm the district court with regard to four of the claims, but reverse and remand with regard to the remaining one, the second cause of action for wrongful seizure of LEPCO and the damages that resulted.
 
 
 33
 * Before beginning our analysis, we pause to correct an error made by the district court in its choice-of-law analysis. The district court noted that the case had been transferred from New York; said that the choice-of-law rules of the transferor court apply when a case is transferred for the convenience of the parties; and held that New York law therefore applied. GBJ I, 950 F.Supp. at 818.
 
 
 34
 In so holding, the district court made two errors. First, it conflated choice-of-law rules with substantive law, assuming without discussion that since New York choice-of-law rules apply, New York law applies.
 
 
 35
 Second, the district court was wrong to use New York choice-of-law rules. The case was not transferred for the convenience of the parties. Rather, it was transferred under 28 U.S.C. § 1406(a), because of improper venue and a lack of jurisdiction. When a case is transferred on that basis, the choice-of-law rules of the transferee court apply. That is, "the transferee court [in Ohio] was required to apply the choice-of-law rules that would have been applicable had the action been commenced in that court." Adam v. J.B. Hunt Transport, Inc., 130 F.3d 219, 230 (6th Cir.1997). If the case had been commenced in Ohio, Ohio choice-of-law rules would have applied. See Klaxon Co. v. Stentor Electric Mfg., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941).
 
 
 36
 Ohio has adopted the approach of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS. Saglioccolo v. Eagle Ins. Co., 112 F.3d 226, 230 n. 3 (6th Cir.1997); Lewis v. Steinreich, 73 Ohio St.3d 299, 652 N.E.2d 981, 984-85 (1995). Accordingly, this court should determine which state has the most significant contacts. See Saglioccolo, 112 F.3d at 230 n. 3; Lewis, 652 N.E.2d at 984-85. Because all parties have acquiesced--without comment--to the use of New York law up to this point, we will not delve too deeply into the "significant contact" analysis. See In re Korean Air Lines Disaster, 932 F.2d 1475, 1495 (D.C.Cir.) ("Unlike jurisdictional issues, courts need not address choice of law questions sua sponte."), cert. denied, 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991).
 
 
 37
 We note that LEPCO, the company at the center of this case, operated in Lockport, New York; that most of the negotiations at issue took place in New York; and that the judgment held by Sequa against LEPCO was from a New York court. The presence of these contacts does not necessarily require application of New York law; rather, we hold that these contacts are sufficient to convince us that no injustice is wrought by applying New York law to these acquiescent litigants. See Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n, 110 F.3d 318, 335 (6th Cir.1997) (quoting Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877-78, 49 L.Ed.2d 826 (1976)).
 
 
 38
 Therefore the district court's error is harmless, though it bears correction.
 
 B
 
 39
 The district court concluded that the Statute of Frauds bars three of the plaintiffs' claims. The district court reached the correct result, but it used the wrong Statute of Frauds.
 
 
 40
 * As a preliminary matter, the district court was correct that if the Statute of Frauds applies, the plaintiffs cannot satisfy it. It is well-settled under New York law that a writing, to be sufficient to satisfy the Statute of Frauds, "must designate the parties, identify and describe the subject matter and state all the essential or material terms of the contract." DeRosis v. Kaufman, 219 A.D.2d 376, 641 N.Y.S.2d 831, 832-33 (N.Y.App.Div.1996). Nothing in the record satisfies any of these requirements. Therefore, the first and third causes of action should be dismissed if the Statute of Frauds applies.
 
 
 41
 The fifth cause of action, for violation of the implied covenant of good faith and fair dealing with regard to repaying LEPCO's notes, also fails if the Statute of Frauds applies. In New York, a covenant of good faith and fair dealing is implied in every contract. See Dalton v. Educational Testing Service, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995). Conversely, "the implied covenant of good faith and fair dealing is limited to performance under a contract ...." Bank of New York v. Sasson, 786 F.Supp. 349, 354 (S.D.N.Y.1992) (emphasis added). Without a valid contract, therefore, the fifth cause of action must also be dismissed--if the Statute of Frauds applies.
 
 2
 
 42
 The Statute of Frauds relied upon by the district court does not apply to this case. Although we affirm the district court on other grounds below, we first need to correct the mis-impression left by the district court's opinion.
 
 
 43
 The Statute of Frauds used by the district court dictates:
 
 
 44
 a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
 
 
 45
 ....2. Is a special promise to answer for the debt, default or miscarriage of another person;
 
 
 46
 N.Y. GEN. OBLIG. LAW § 5-701.
 
 
 47
 While the Statute of Frauds refers to "promises to answer for [a] debt," however, this case concerns a bilateral agreement to assume a debt. The latter, a common sort of business deal, can be enforced without a writing. The former, a suretyship, cannot. See BLACK'S LAW DICTIONARY 1293 (5th ed.1979) (defining contract for suretyship as promise to "answer[ ] for [a] debt").
 
 
 48
 New York law makes this distinction. The leading case, Martin Roofing, Inc. v. Goldstein, 60 N.Y.2d 262, 469 N.Y.S.2d 595, 457 N.E.2d 700 (1983), cert. denied, 466 U.S. 905, 104 S.Ct. 1681, 80 L.Ed.2d 156 (1984), is worth quoting at length. In Martin, which applied the Statute of Frauds to a suretyship, the distinction so pivotal to this case is made very clear:
 
 
 49
 The statute provides that a "special promise to answer for the debt, default or miscarriage of another" may not be enforced unless it is in writing. Generally, the statute applies to circumstances in which the promisor has acted as surety of another (see 3 WILLISTON, CONTRACTS [3d ed.], § 475; RESTATEMENT, CONTRACTS 2D, § 112).... We deal here with plaintiff's claim that defendant's promise is not within the statute because the promisor owed plaintiff an independent duty to pay. As to such promises, it has been stated that "[i]f, as between the promisor and the original debtor, the promisor is bound to pay, the debt is his own and not within the statute. 'Contrariwise if as between them the original debtor still ought to pay, the debt cannot be the promisor's own and he is undertaking to answer for the debt of another.' " (Witschard v. Brody & Sons, 257 N.Y. 97, 177 N.E. 385, quoting 1 WILLISTON, CONTRACTS, § 472.) In the latter case the promise is unenforceable in the absence of some memorandum.
 
 
 50
 Id. at 701 (emphasis added, citations omitted). The case continues, explaining the rationale for the distinction:
 
 
 51
 The purpose of the rule is evidentiary, to avoid perjury, and incidentally to serve as a cautionary measure to avoid ill-considered actions (3 WILLISTON, CONTRACTS [3d ed.], § 452; FARNSWORTH, CONTRACTS, § 6.3; RESTATEMENT, CONTRACTS 2D, § 112). In most oral contracts, a writing is not required because the promisor has received something and the circumstances show probable liability. When a party promises to answer for the debt of another, however, the benefit to the promisor is not apparent and so the promise, if it is to be enforceable under the statute, must either be evidenced by writing or plaintiff must prove it is supported by a new consideration moving to the promisor and beneficial to him and that the promisor has become in the intention of the parties a principal debtor primarily liable. Thus, it was plaintiff's burden within this rule to produce evidence showing a consideration moving to defendant and showing that the parties intended, as ascertained from the language used and from all the facts and circumstances surrounding the transaction (Clark v. Howard, 150 N.Y. 232, 44 N.E. 695), that an independent contract was created between them which obligated defendant to satisfy the corporation's debt in any event.
 
 
 52
 Ibid. (emphasis added, citations omitted).
 
 
 53
 The district court relied on Goldstein to dismiss the three contract-based counts, but Goldstein clearly requires the opposite conclusion. According to the plaintiffs' allegations, EOP was paying off LEPCO's debts, and receiving 85% of LEPCO's stock in exchange. This is an assumption of debt, not a suretyship, and so this part of the Statute of Frauds does not apply.
 
 3
 
 54
 Unfortunately for the plaintiffs, there is another Statute of Frauds in New York, under the UCC, which does apply to this case. It invalidates the alleged oral agreement, and so bars the three contract-based claims.
 
 This other Statute of Frauds dictates that
 
 55
 A contract for the sale of securities is not enforceable by way of action or defense unless(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or
 
 
 56
 (b) delivery of a certificated security or transfer instruction has been accepted, or transfer of an uncertificated security has been registered and the transferee has failed to send written objection to the issuer within ten days after receipt of the initial transaction statement confirming such registration or payment has been made[;] but the contract is enforceable under this provision only to the extent of such delivery, registration or payment;
 
 
 57
 ....
 
 
 58
 N.Y. UCC § 8-319 (alterations added).[1] The agreement alleged by the plaintiff--an exchange of stock for an infusion of capital--is covered by this statute. Therefore, one of the statutory exceptions must apply for the plaintiffs to avoid dismissal. Subsection (a) obviously does not apply. Nor do the subsections omitted from the quotation above.
 
 
 59
 Subsection (b), the "part performance" exception, comes closest to applying, but still does not. New York law requires that actions, to be considered part performance for these purposes, be "unequivocally referable" to the alleged oral agreement. See, e.g., Newman v. Crazy Eddie, Inc., 119 A.D.2d 738, 501 N.Y.S.2d 398, 399 (N.Y.App.Div.1986) (citing Anostario v. Vicinanzo, 59 N.Y.2d 662, 463 N.Y.S.2d 409, 450 N.E.2d 215 (1983)). To meet this criterion, "[i]t is not sufficient ... that the oral agreement gives significance to [EOP's] actions. Rather, the actions alone must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement." Anostario, 463 N.Y.S.2d 409, 450 N.E.2d at 216.
 
 
 60
 In the present case, EOP does possess Callanan's stock certificate for all of LEPCO's shares. The stock certificate was transferred pursuant to EOP's purchase of Sequa's interest in LEPCO. It therefore appears that the certificate was transferred as collateral from a secured creditor to its successor in interest, and was not transferred pursuant to a sale of shares. We have no basis to conclude that EOP's possession of the certificate is unequivocally referable to the alleged agreement; a fortiori, we cannot conclude that there is a disputed issue of fact on that question. FED.R.CIV.P. 56(c). Cf. Palmerton v. Envirogas, Inc., 80 A.D.2d 996, 437 N.Y.S.2d 483 (N.Y.App.Div.1981) (finding disputed issue of fact on "unequivocally referable" question); Ballan v. Waterman, 103 A.D.2d 789, 477 N.Y.S.2d 432 (N.Y.App.Div.1984) (same). Therefore, subsection (b) does not apply to this case.
 
 
 61
 Because this alternate Statute of Frauds bars the plaintiffs' contract-based claims, we affirm the district court's dismissal of the first, third, and fifth counts. See McDowell v. Krawchison, 125 F.3d 954, 957 (6th Cir.1997) (affirming district court's decision on grounds not considered by the district court).
 
 C
 
 62
 The district court's ruling on the fourth claim, for fraud, was correct and we affirm. Under New York law, a plaintiff cannot sue for an alleged fraudulent representation if the representation was at the heart of an alleged contractual agreement. For a fraud claim to have an identity independent from a related contract claim, the alleged fraud must be "collateral and extraneous" to the contract.
 
 
 63
 This result is not as clear in New York law as it could be, and so we will briefly outline the basis for our conclusion. The seminal New York case in this area is Channel Master Corp. v. Aluminium Ltd. Sales, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958), which reached the following conclusion:
 
 
 64
 [T]he allegations in the complaint describe a case where a defendant has fraudulently and positively as with personal knowledge stated that something was to be done when he knew all the time it was not to be done and that his representations were false. It is not a case of prophecy and prediction of something which it is merely hoped or expected will occur in the future, but a specific affirmation of an arrangement under which something is to occur, when the party making the affirmation knows perfectly well that no such thing is to occur. Such statements and representations when false are actionable.
 
 
 65
 Id. at 836 (quotation marks omitted).
 
 
 66
 On its face, Channel Master would seem to be directly on point. Unfortunately, its status in New York law is somewhat cloudy. Compare Best Western Int'l, Inc. v. CSI Int'l Corp., No 94-Civ-0360, 1994 WL 465905 (S.D.N.Y. Aug.23, 1994) (Judge McKenna holding that Channel Master has been limited, and refusing to allow plaintiff to use Channel Master theory to "dress up" contract claim as tort claim) with McDarren v. Marvel Entertainment Group, Inc., No. 94-Civ-0919, 1994 WL 388994 (S.D.N.Y. July 22, 1994) (Judge McKenna citing and applying above portion of Channel Master, and not expressing doubt as to its vitality).
 
 
 67
 A convincing reconciliation of these two conflicting notions--allowing a Channel Master fraud claim, or barring it as mere "dressing up" of a contract claim--was recently stated by Judge Sotomayor:
 
 
 68
 It is well settled under New York law that a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.
 
 
 69
 It is equally well settled under state law that if a promise was made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact. And it is precisely such a misrepresentation which can serve as the basis for a claim of fraud.
 
 
 70
 Any apparent tension between the two aforementioned principles of New York law has been reconciled through a rule, widely adopted by the state and federal courts, pursuant to which a false promise can support a claim of fraud only where that promise was "collateral or extraneous" to the terms of an enforceable agreement in place between the parties. Sudul v. Computer Outsourcing Svcs., 868 F.Supp. [59,] 62 ("A long line of New York courts have carved out an exception to the rule laid out in Sabo and Channel Master.")....
 
 
 71
 International CableTel Inc. v. Le Groupe Videotron Ltee, 978 F.Supp. 483, 486-87 (S.D.N.Y.1997) (quotation marks and some citations omitted). To summarize, a fraud claim can only be maintained alongside a claim for breach of contract if the fraudulent promise was "collateral or extraneous" to the alleged agreement. In other words, the defendant must have fraudulently induced the plaintiff to enter into the agreement, and that inducement must be a promise other than merely pledging to perform the terms of the contract.
 
 
 72
 The present case fits this "carve-out" from Channel Master, because the alleged fraudulent representation was at the heart of the alleged agreement, and not "collateral and extraneous." The plaintiffs' complaint names the terms of the contract as the relevant promises. As such, the tort claim is indistinguishable from the contract claim, and cannot exist alongside it. The plaintiffs try to rescue their claim by pointing out that the alleged fraud was extraneous to the deal between EOP and Sequa. The plaintiffs are right that the alleged fraud was extraneous to something, to be sure, but it was not extraneous to the alleged agreement at the heart of their case. The district court used the "collateral and extraneous" standard and applied it properly, and so we affirm.
 
 D
 
 73
 Finally, the plaintiffs argue that the second cause of action, seeking return of control of LEPCO to Callanan, was improperly dismissed. Furthermore, they point out that the defendants' motion for summary judgment did not even address the claim. They are correct and we reverse the district court on this point.
 
 
 74
 * In dismissing the second cause of action, the district court stated thatFor the reasons previously set forth in this Opinion, the Plaintiff has failed to create a genuine issue of material fact in regard to this contention that any act of the Defendants was done in a fraudulent manner. Therefore, Plaintiffs have also failed to carry their burden in showing that a genuine issue of material fact exists in regard to its Count Two. This Court finds itself in accord with Judge Cedarbaum and refuses to impose the extraordinary remedy of injunctive relief.
 
 
 75
 GBJ I, 950 F.Supp. at 822.
 
 
 76
 It is unclear why the district court refers to "fraud," which was the basis not of the second cause of action but rather the fourth. The second cause of action challenges the defendants' authority to take over the firm. It happens to use the word "fraudulently," but the claim is clearly one for equitable relief. Furthermore, there are definite disputed issues of material fact regarding this claim in the plaintiffs' verified complaint. See Lavado v. Keohane, 992 F.2d 601, 605 (6th Cir.1993) (noting that a verified complaint may suffice to respond to a summary judgment motion).
 
 
 77
 The defendants seized control of LEPCO under the authority of the "Stock Pledge" that they acquired from Sequa when they purchased Sequa's judgment. EOP "foreclosed" (though there is nothing in the record to indicate that EOP followed any formalities), arguing that LEPCO had defaulted under the terms of the pledge. The plaintiffs set forth in their complaint a complex argument that a stockholder agreement prevents EOP from taking over all of LEPCO's stock without the approval of the plaintiffs. This argument is plausible.[2]
 
 2
 
 78
 Approaching this question from a different angle, we note further that the defendants' motion for summary judgment provided an insufficient basis for dismissal of the second cause of action. The defendants' one-page motion for summary judgment purported to cover all five counts, but the accompanying memorandum did not make any argument as to why the second count should be dismissed. The only mention of the second cause of action came in the statement of facts, where the defendants stated that the claim was "ruled upon by Judge Cedarbaum" when she denied the plaintiffs' motion for a preliminary injunction.
 
 
 79
 Judge Cedarbaum did reject the motion for a preliminary injunction, of course, but it was a motion for a preliminary injunction. Her oral comments indicate (there was no written opinion) that she rejected the motion not on the merits, but because she was merging it into the claim for final injunctive relief, on which she expected to have a trial.
 
 
 80
 Because the defendants have provided no basis for a dismissal of the second cause of action, their motion for summary judgment should not have been granted. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact.") (quotation marks omitted).
 
 
 81
 It would not be proper for us to affirm the dismissal of this count when the defendants have presented absolutely no argument. To hold otherwise would defeat the purpose of having formal motions. In an analogous case, we made the following point:
 
 
 82
 Wausau attempts to rely on the fact that it had "specifically requested the relief ultimately granted by the district court" in its memorandum in opposition to PSI's motion. See J.A. at 170 & 186-87 ("the facts of this case preclude entry of partial summary judgment in favor of PSI and dictate that Wausau is entitled to a declaration that it has no duty to defend PSI in the subject environmental matters"). Such conclusory statements offered at the beginning and end of a memorandum of law are clearly not a motion.
 
 
 83
 Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 104 (6th Cir.1995). The present case provides an admittedly weaker basis for rejection, because here there was a motion for summary judgment that purported to include dismissing the second cause of action. But, there was no mention made of, nor argument leveled against, the second cause of action. In that sense, there was "not a motion" with regard to the second claim.
 
 
 84
 Although a court can act sua sponte to dismiss a claim on summary judgment, it needs to give notice that it is doing so. Id. at 105. Here, there was no reason for the plaintiffs to believe that their second cause of action was in danger of being dismissed. The defendants made no argument, so the plaintiffs had nothing substantive to which they could respond. If the defendants or the district court had an argument that, as a matter of law, the plaintiffs' interpretation of the stock pledge agreement and stockholders' agreement was wrong, they needed to set that argument forth. Without doing so, this claim could not be dismissed at summary judgment.
 
 
 85
 Therefore, the dismissal of the second cause of action should be reversed.
 
 III
 
 86
 Based on the foregoing, we REVERSE the district court as to the second cause of action and REMAND for further proceedings. We AFFIRM on the remaining counts.
 
 
 
 [1]
 The statute is not limited to traditional brokered sales of shares of stock. See N.Y. UCC § 8-102, cmt. 2 ("Interests such as the stock of closely-held corporations, although they are not actually traded upon securities exchanges, are intended to be included....")
 
 
 [2]
 A point raised by the plaintiffs at oral argument--that even if EOP could legally control the LEPCO stock, it did not follow any of the necessary formalities of corporate procedure in assuming control of LEPCO--bolsters our conclusion here