**HEALTHONE, INC., Plaintiff,**

**v.**

**COLUMBIA WESLEY MEDICAL CENTER and Columbia/HCA Healthcare Corporation, Defendants.**

**No. 97–1494–WEB.**

United States District Court,
D. Kansas.

April 7, 2000.

Dennis L. Gillen, Depew and Gillen, L.L.C., Wichita, KS, Larry B. Spikes, Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., Wichta, KS, Sheila M. Bossier, HealthOne, Inc., Jackson, MS, Thomas C. Gerity, Copeland, Cook, Taylor & Bush, Ridgeland, MS, for Plaintiff.

John H. Gibson, Judd A. Liebau, Boyer, Donaldson & Stewart, Wichita, KS, Gerald L. Green, Gilliland & Hayes, P.A., Hutchinson, KS, Mark R. Maloney, Gilliland & Hayes, P.A., Wichita, KS, George A. Shannon, Jr., Carlos Mattioli, Elizabeth D. Alvardo, Shannon, Martin Finklestein & Sayre, P.C., Houston, TX, for Defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

Plaintiff HealthOne, Inc., filed this action alleging that defendants Columbia Wesley Medical Center ("Wesley") and Columbia/HCA Healthcare Corporation ("Columbia/HCA") breached a contract with HealthOne and are liable for actual and punitive damages. Wesley has filed a counterclaim alleging that HealthOne breached the contract. The matter is now before the court on the defendants' motions for summary judgment (Docs.160, 164) and on defendant Wesley's motion for a determination of controlling law (Doc. 162). Although the parties have requested oral argument on the motions, the parties' briefs present the issues clearly and the court concludes that oral argument would not assist in deciding the issues presented. See D.Kan.R. 7.2.

### I. Background.

The contract in question was entered into by HealthOne and Wesley on October 17, 1996. According to recitals in the contract, HealthOne is in the business of securing and collecting "third party liability claims" on behalf of hospitals and has designed copyrighted forms and procedures "to establish hospitals as priority creditors" with regard to third party claims. Wesley, according to the recitals, wanted to implement and utilize HealthOne's forms and techniques in the collection of third party liability claims. HealthOne agreed to provide Wesley "a systematic priority claims process for use in the collection of third party liability cases." The contract called for Wesley to include HealthOne's copyrighted language in Wesley's patient admission forms and for HealthOne to provide a representative to work with Wesley on potential third party liability cases. Wesley agreed to exclusively refer all third party liability cases to HealthOne. If HealthOne's investigation showed that a claim was not a third party liability case, it was to redirect the claim to Wesley patient representatives for the normal collection process and there would be no fee due to HealthOne. If a claim was found to a third party liability claim, however, HealthOne was to be paid a fee of 25% of its actual collections on the claim. The commission was payable at the end of each month based on actual collections posted during the month. The term of the contract was to be two years beginning November 1, 1996, but Wesley could terminate the contract at any time, with or without cause, upon 180 days' written notice.

### II. Motion for Determination of Controlling Law.

The contract between HealthOne and Wesley contains a clause stating: "It is agreed that this Contract is entered into under the laws of the State of Mississippi, and any disputed portions of said Contract will be interpreted by and under the laws

of the State of Mississippi." In a motion for determination of controlling law, Wesley argues that despite this provision "Kansas law applies because there is no language giving exclusive jurisdiction to the Mississippi Courts." Doc. 162 at 4. In support of its argument Wesley cites numerous cases discussing the effect of forum selection clauses. Such cases have nothing to do with determining which state's law governs a dispute, however; they concern the selection of the appropriate forum in which to bring a claim.

■ Plaintiff initially filed this action in state district court in Hinds County, Mississippi. The action was then removed to the U.S. District Court for the Southern District of Mississippi, which determined that venue in that district was improper; the court therefore transferred the action to this district pursuant to 28 U.S.C. § 1406(a). *See* Doc. 9 at 5.[1] When a case is transferred because of improper venue, the choice-of-law rules of the state of the transferee court apply. *See GBJ Corp. v. Eastern Ohio Paving Co.*, 139 F.3d 1080, 1084–85 (6th Cir.1998); *Leader Nat'l. Ins. Co. v. Shaw*, 901 F.Supp. 316, 320 (W.D.Okla.1995). Thus, Kansas' choice of law rules determine which state's substantive law governs the dispute.

■ "Federal courts in Kansas routinely enforce the parties' contractual choice-of-law provisions under Kansas choice-of-law rules." *Altrutech, Inc. v. Hooper Holmes, Inc.*, 6 F.Supp.2d 1269, 1273 (D.Kan.1998). "Under Kansas law, the enforceability of a contractual choice-of-law provision turns on whether the forum selected bears a reasonable relation to the contract at issue." *Id.* (Citing *Atchison Casting Corp. v. Dofasco, Inc.*, 889 F.Supp. 1445, 1455 (D.Kan.1995)). *See also National Equipment Rental, Ltd. v.*

*Taylor*, 225 Kan. 58, 61, 587 P.2d 870, 873 (1978) (applying a contractual choice of law provision where the transaction at issue at least had "a reasonable relation" to the denominated state). In this case, a reasonable relation exists because HealthOne's corporate headquarters are in Mississippi, and payments under the contract were to be directed to HealthOne in Mississippi. *Cf. Altrutech*, 6 F.Supp.2d at 1273; *Restatement (Second) Conflict of Laws*, § 187, comment f. The court will therefore give effect to the choice of law provision in the parties' contract and will apply Mississippi law, with one caveat: as will be explained below, Mississippi law will not be applied insofar as the result would contravene fundamental public policy of the law of Kansas.

■ In tort cases, Kansas courts will not apply the law of another state if such application is contrary to the settled public policy of Kansas. *See e.g. Hartford Accident & Indem. Co. v. American Red Ball Transit Co.*, 262 Kan. 570, 574, 938 P.2d 1281 (1997). The court finds no Kansas cases applying the same rule to a contractual choice of law provision, but concludes Kansas courts would likely follow the *Restatement (Second) on Conflicts of Law* § 187, under which a contractual choice of law will not be applied if application of the law of the chosen state would be contrary to a fundamental policy of Kansas where Kansas has a materially greater interest than the chosen state in the determination of the particular issue, and where Kansas law would apply in the absence of an effective choice of law by the parties. *See Hartford Accident & Indem. Co. v. American Red Ball Transit Co.*, 262 Kan. 570, 575, 938 P.2d 1281, 1286 (1997); *St. Francis Regional Med. Center, Inc. v. Critical Care, Inc.*, 997 F.Supp. 1413, 1436, n. 30 (D.Kan.1997) ("Both the Kansas Supreme

1. Plaintiff argues that the transfer was made pursuant to § 1404(a), pointing out that the district court did not expressly say whether it was relying on § 1404(a) or 1406(a). The court's opinion made clear, however, its finding that venue was not merely inconvenient but was improper in the Southern District of Mississippi. Thus, the transfer was pursuant to § 1406(a). *See* Doc. 9 at 4–6. The court went on to rule in the alternative that the transfer would also be appropriate under § 1404(a).

Court and the Tenth Circuit Court of Appeals have looked to Restatement (Second) Conflict of Laws § 187 (1971) for guidance."). In this case Kansas has a materially greater interest in the determination of the issues presented, and its law would govern in the absence of an effective choice of law.

### III. *Defendant Wesley's Motion for Summary Judgment.*

#### A. *Facts.*

For purposes of Wesley's motion for summary judgment, the court finds no genuine dispute as to the following facts (or to the facts set forth above in the Background section).

1. The contract required Wesley to use HealthOne's copyrighted assignment language in Wesley's patient admissions agreements.

2. The assignment language in the admission agreements included the following: "Debtor [the patient] absolutely assigns to the hospital all insurance benefits under which Debtor is an insured; whether hospital, medical, or liability insurance, and also absolutely assigns to the hospital the proceeds of any judgement or settlement of any claim against any third party and any and all other amounts which may be determined to be owed to Debtor in connection with any injury suffered by patient which gives rise to the debt incurred during this period of hospitalization. * * * I authorize and direct that all such payments and proceeds shall be made directly to the hospital under the terms of this assignment. To the extent that the hospital receives such proceeds and/or payments, this will be payment of the debt, but shall not relieve Debtor of the obligation to pay when and as due that portion of the debt not satisfied by such proceeds and/or payments. * * * If the hospital receives more money than the amount of the debt, the hospital may apply the difference to any unpaid bills of the Debtor to the hospital from any other period(s) of hospitalization and any attorneys' fees and expenses Debtor may owe under this agreement. If the debt has been paid in full, then the hospital will, within ninety days of the same, refund to the Debtor any overpayment." Wesley Att. B.

3. The assignment is the key to the HealthOne system. The assignment must be signed before the HealthOne system can work. HealthOne claims representatives could not pursue payment from payors absent the assignment.

4. In July of 1996, Matthew J. Glavin published an article in "Dispatch," a newsletter of the Virginia Chapter of the Healthcare Financial Management Association. Wesley Att. D. The article was entitled "The Healthcare Provider: A Priority Creditor." For his article, Glavin interviewed Burns McFarland, the president of HealthOne, Inc., regarding how HealthOne's system operated and how it would assist hospitals in the collection of their bills. The article contained the following statements:

> Quite simply, healthcare providers have long suffered from non-payment for services rendered even when insurance benefits exist. A significant number of patients are treated for injuries for which third-party liability insurance applies. However, providers have been extraordinarily passive in seeking these insurance proceeds and have suffered accordingly.

> \* \* \* \* \* \*

> The patient who suffers injuries due to the fault of another all too often eagerly pursues an insurance settlement for his own benefit and ignores his financial obligation to the healthcare provider. Whether represented by an attorney or not, it is commonplace for the patient/debtor to leave the provider with medical bill in hand, present that bill to the third-party liability insurance carrier, receive a settlement or trial verdict, and then decide whether to pay the provider charges. All too often, the bill is

simply ignored, and if ever pursued by the provider, the bankruptcy courts readily discharge the debt.

This new concept [the HealthOne system] takes full advantage of an already existing pool of benefits available through third-party liability insurance. The healthcare provider is advanced to a far superior position so it may more efficiently pursue rightful compensation. By virtue of a copyrighted process using carefully crafted documents and sound internal procedures, the healthcare provider is elevated to the status of a priority creditor, and in essence, promoted to a level equal to the patient/plaintiff.

Part of this process involves a thorough investigation of the nature of the claim and the likelihood of a successful recovery. Admission forms are carefully reviewed and pertinent parties, witnesses, and insurance carriers located. While the most common third-party liability scenario to be pursued is that of automobile liability or uninsured motorist coverage, it can also include claims under homeowner's policies, premises liability policies, and personal umbrella policies. Under the new process, the healthcare provider is not only afforded a safeguarded right to intervene in a claim, but is also afforded protection should the patient/plaintiff file for bankruptcy.

Perhaps this process is best illustrated by reviewing a typical scenario in the current system:

A patient enters the healthcare system for injuries received in an automobile accident which was the fault of another. After he recovers [from his injuries], he hires an attorney and pursues a claim against the negligent driver. A compromise settlement is reached, or the claim escalates to trial and a subsequent verdict is received. Whether by settlement or verdict, a check is issued to the patient and his attorney. At that point, the same medical bill that the claimant so heartily relied on to reach his settlement or verdict is then reinspected by the plaintiff and his attorney. Typically, either the plaintiff offers a partial settlement of the medical bill or ignores it. Providers often accept a lesser payment or face the threat of the plaintiff filing bankruptcy and discharging the debt altogether. If the provider relies on a collection agency, it not only faces the same compromised settlement of the medical bill, but also has to pay up to 50% of the principal to the collection agency.

Under the new system of recovery, the provider joins the plaintiff in his claim against the insurance company by putting the insurance carrier on notice of its status as a priority creditor. If a settlement is reached, the provider can demand direct payment. If the case proceeds to trial, the provider can intervene in the action and participate as a plaintiff against the negligent party. Should the plaintiff attempt to eschew his financial responsibility for the medical bills, the provider is protected in bankruptcy court. In many states, the provider can actually recover attorney's fees over and above full recovery.

5. HealthOne routinely includes the Glavin article in its marketing packet which is sent to prospective hospital clients. HealthOne provided Wesley with a copy of the Glavin article during the negotiation of the subject contract.

6. Prior to entering the contract with HealthOne, Wesley's normal collection process had included seeking recovery on its patients' own PIP and health insurance coverage in accident cases.

7. Before it executed the contract, Wesley had the contract reviewed by an attorney to see whether it protected Wesley.

8. HealthOne provided a copy of the Glavin article to a new employee to help her better understand how the HealthOne system worked.

9. In soliciting Wesley's business, Burns McFarland informed Wesley that HealthOne had done a hospital "lien law study" and concluded that the HealthOne system would be effective in Kansas.

10. Wesley received the first HealthOne invoice on December 3, 1996. HealthOne requested payment on the invoice for a 25% commission on all insurance payments received under patients' Personal Injury Protection ("PIP") coverage in accident cases and under patients' own health insurance coverage where PIP benefits were also available. Wesley refused to pay the invoice. After receiving the invoice, Wesley expressed the view that the "third party liability claims" covered by the contract meant claims against persons who had caused the patient's injuries or their insurance carriers, and that HealthOne was not entitled to commissions on collections from the patient's own insurance (including the patient's PIP, health, workers' compensation, Medicare and Medicaid coverage). HealthOne, on the other hand, took the position that all accident cases were to be referred to it, and that it was entitled to a commission on any insurance payments collected in those cases, including the patient's PIP benefits, health insurance, workers' compensation, homeowners', Medicare and Medicaid, and all forms of auto insurance, as well as on any collections from liability or other insurance held by third persons. According to HealthOne, a third party liability claim is one in which "anyone other than the patient is responsible for the debt." Pl. Mem. at 18.

11. The parties were unable to agree upon the matter. Wesley refused to pay the invoice and HealthOne refused to exclude the contested items from the invoice.

12. Wesley gave HealthOne notice of termination of the contract in accordance with the contract.

13. After the dispute arose, Wesley refused to permit a HealthOne representative to use an office at the hospital that was previously made available. Wesley also ceased referring cases to HealthOne in the six-month period before the termination of the contract became effective.

14. Wesley subsequently called upon HealthOne to make collections on several cases that had previously been referred. HealthOne did so and was paid in accordance with the contract.

B. *Discussion.*

1. *"Third Party Liability Claims."*

Wesley first seeks a determination as a matter of law that its interpretation of the term "third party liability claims" is correct and that HealthOne's demand for payment at variance with that interpretation "was so far removed from the contract language as to amount to a breach of the contract...." Wesley Mem. at 10. In response, HealthOne argues that Wesley's interpretation of "third party liability claims" is contrary to the meaning of that term as understood in the healthcare industry.

Under Mississippi law, "When a contract is clear and unambiguous on its face, its construction is a matter of law, and not fact, and [it] must be construed and enforced as written." *Griffin v. Tall Timbers Dev., Inc.,* 681 So.2d 546, 551 (Miss. 1996). One should look to the "four corners" of the contract whenever possible to determine how to interpret it. *McKee v. McKee,* 568 So.2d 262, 266 (Miss.1990). Therefore, when interpreting a contract, the court's concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy. *Simmons v. Bank of Miss.,* 593 So.2d 40, 42–43 (Miss.1992). The most basic principle of contract law is that contracts must be interpreted by objective, not subjective standards. A court must determine the meaning of the language used, not attempt the ascertainment of some possible but unexpressed intent of the parties. *Id.* "It is

well settled that the words of a contract are to be given their ordinary meanings." *Continental Cas. Co. v. Hester,* 360 So.2d 695, 697 (Miss.1978).

■ The recitals in the agreement show that the parties intended to employ HealthOne's proposal for increasing hospital collections on "third party liability claims." Although HealthOne argues that "third party liability claims" includes any claim other than one where the patient alone is responsible for the debt to the hospital, such a definition is at odds with the ordinary meaning of the term as used in reference to insurance claims and tort law. Abundant cases, including decisions from Mississippi state and federal courts, make clear that "third party liability cases" and "third party liability claims" are commonly understood to refer to claims against third-party tortfeasors. *See e.g., Sessoms v. Allstate Ins. Co.,* 634 So.2d 516 (Miss.1993); *City of Jackson v. Little,* 248 So.2d 795, 796 (Miss.1971); *Davidson v. State Farm Fire & Cas. Co.,* 641 F.Supp. 503 (N.D.Miss.1986). As such, the terms would include claims against persons who may be liable for having caused a patient's injuries. By contrast, claims on behalf of an insured alleging that his own insurance company is obligated to pay or reimburse him under a contract of insurance are typically referred to as "first-party claims." *See Sessoms,* 634 So.2d at 519–20. These cases and numerous others make clear that "third party liability" is ordinarily viewed from the perspective of the injured party and that it commonly refers to persons not aligned or in privity with the injured party whom the law holds responsible for the injuries. Thus, the ordinary meaning of "third party liability claims" would not encompass claims by or on behalf of the patient against his own insurer. *See also Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 355 Md. 566, 735 A.2d 1081, 1090 (1999) ("automobile liability insurance policies typically provide coverage for third party liability claims as well as first party claims such as uninsured motorist claims, collision, comprehensive, medical payments, and personal injury protection.")

HealthOne concedes that the foregoing understanding of "third party liability claims" is common to insurance claims, but contends the term has a different meaning in the healthcare industry. HealthOne cites no competent evidence to support this contention. Instead, it cites deposition testimony in which witnesses were asked by counsel for HealthOne to give their understanding of the term "third party payor." Pl. Mem. at 12–13. The testimony of these witnesses makes clear that in the healthcare field "third party payor" refers to anyone who pays the bill other than the patient, including the patient's own insurer. But the term "third party payor" was not used in the contract between Wesley and HealthOne and has no relevance to the issue before the court. Nor has HealthOne cited any other evidence that "third party liability claim" has a different meaning in the healthcare field than it does in insurance and tort law. In fact, the record suggests the opposite. The Matthew Glavin article that HealthOne gave Wesley during contract negotiations indicates the term has the same meaning in both fields. The Glavin article discussed "[t]he patient who suffers injuries due to the fault of another" who presents a hospital bill "to the third-party liability insurance carrier" and receives a settlement or trial verdict. The HealthOne system, Glavin asserted, "takes full advantage of benefits available through third party liability insurance" and permits the hospital to "intervene in the action ... against the negligent party." This article, published in the newsletter of a healthcare financial management association, reflects an understanding of "third party liability claims" at odds with HealthOne's suggested interpretation.[2] *Cf. Restatement (Sec-*

2. The article mentions at one point that "While the most common third-party liability scenario to be pursued in that of automobile liability or uninsured motorist coverage, it

*ond) of Contracts* § 220 (an agreement is interpreted in accordance with a relevant usage if each party knew or had reason to know of the usage). Moreover, interrogatories from several other hospitals that have contracts with HealthOne to collect third party liability claims disclose that these hospitals generally pay HealthOne a commission on collections from third party liability insurance but not on collections from patients' own insurance.

In addition to its arguments set forth above, HealthOne also attempts to alter the ordinary meaning of "third party liability claims" by focusing solely on the meaning of "third party." Pl. Mem. at 13. That approach is unavailing because it ignores part of the relevant contract language. *Cf. Brown v. Hartford Ins. Co.,* 606 So.2d 122, 126 (Miss.1992) ("[W]hen construing a contract, the court will read the contract as a whole, so as to give effect to all of its clauses.").

In sum, the court concludes that the plain and ordinary meaning of "third party liability claims" and "third party liability cases" does not encompass claims by a patient (or on behalf of a patient) against his own insurer—whether it be the patient's auto, health or homeowner's insurance, or Medicaid or Medicare coverage. Nor would the ordinary meaning of these terms include a patient's demand for, or receipt of, PIP benefits under a contract of insurance that covers his injuries. This is true even though the patient may be a third party unrelated to the holder of the automobile liability insurance policy under which the benefits are due.[3] *Cf. Donaldson v. Liberty Mut. Ins. Co.,* 947 F.Supp. 429, 432 (D.Haw.1996) (plaintiff passenger's position in seeking no-fault benefits under policy of owner was "effectively that of a first party to an insurance contract.").

The court thus agrees with Wesley that HealthOne requested payment on collections that were not third party liability claims under the contract. Despite this, Wesley is not entitled to summary judgment on HealthOne's claim for breach of contract. A breach of an agreement by one party generally excuses the other from further performance only where the breach is material. *See Matheney v. McClain,* 248 Miss. 842, 161 So.2d 516, 520 (1964). Even assuming for purposes of argument that HealthOne's call for payment in excess of what was due under the contract was a breach of the agreement, Wesley has not argued—and the court cannot conclude from the few facts set forth in the summary judgment motion— that the breach was material as a matter of law. The standard for determining whether a breach was material must necessarily be both "imprecise and flexible" to "further the purpose of securing for each party his expectation of an exchange of performances." *Restatement (Second) of Contracts* § 241, comment a (1981). A breach is material only when there "is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose," *Gulf South Capital Corp. v. Brown,*

can also include claims under homeowner's policies, premises liability policies, and personal umbrella excess policies." No indication is given that this refers to anything other than insurance policies covering the third party tortfeasor.

3. Such "no fault" payments, which are required to be provided for in automobile liability policies in Kansas, are not third party liability claims. When a person within the PIP coverage *required by law sustains injuries* in an auto accident, PIP payments must be made to the person without regard to fault for the injuries. In effect the injured person is an insured under the owner's automobile policy. Subject to certain limitations, if the injury is caused under circumstances giving rise to legal liability against a tortfeasor, the injured person may pursue a court action against the tortfeasor seeking damages for the injuries. *See* K.S.A. § 40–3113a. Such an action is a "third party liability claim" within the ordinary meaning of the term. In the event of recovery by the injured person in the tort action, the insurer who provided PIP benefits is subrogated and has a lien to the extent any duplicative PIP benefits are recovered.

183 So.2d 802, 805 (Miss.1966), or when "the breach of the contract is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract," *Matheney v. McClain,* 248 Miss. 842, 849, 161 So.2d 516, 520 (1964). HealthOne asserts that Wesley never offered to pay the sum Wesley believed to be due under the contract and that Wesley stopped referring cases after the dispute arose. A reasonable jury could find that notwithstanding HealthOne's erroneous interpretation, Wesley had a duty to continue to perform under the contract for the six months it was in effect, and that HealthOne is entitled to lost profit damages from Wesley's failure to do so. *Cf. J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co.,* 683 So.2d 396, 402 (Miss.1996) (although plaintiff was attempting to "squeeze" additional money from defendant, plaintiff's actions were not a material breach of the parties' agreement and did not entitle defendant to unilaterally rescind the contract.). Accordingly, Wesley's motion for summary judgment on HealthOne's claim for breach of contract is denied.

### 2. *Assignment of Tort Claims.*

Wesley next argues it is entitled to summary judgment because the HealthOne assignment "is an illegal assignment of a tort claim" and is unenforceable.[4] Wesley Mem. at 10–11. In response, HealthOne contends the assignment does not violate public policy because it is merely an attempt to recover a contractual debt.[5]

■ The court concludes the HealthOne assignment does not violate the Kansas public policy against assignment of tort claims. Although Kansas has recognized a policy against assignment of tort claims, *see Heinson v. Porter,* 244 Kan. 667, 772 P.2d 778, 783–85 (1989), overruled in part on other grounds by *Glenn v. Fleming,* 247 Kan. 296, 799 P.2d 79 (1990), several jurisdictions have held that an assignment of whatever proceeds are recovered in a personal injury claim does not violate that policy so long as the plaintiff retains control of the lawsuit without interference from the assignee. *See* 6 Am.Jur.2d, Assignments § 66. Moreover, a specific exception appears to have been recognized for assignments of the proceeds of a personal injury claim to a treating hospital. *See id.* § 68 (citing cases). Several jurisdictions have found that such assignments do not violate the public policy against assigning tort claims. *See* "Assignability of Proceeds of Claim for Personal Injury or Death," 33 A.L.R.4th 82, § 6 (citing cases). Moreover, as HealthOne points out, public policy in Kansas as embodied in the Kansas hospital lien statute favors recovery of expenses by a treating hospital in a personal injury action brought by the patient. Given the modern trend toward restricting the concept of champerty, Kansas courts would be unlikely to find the HealthOne assignment void for violating the policy against assignment of tort claims. *Cf. Cullen v. Atchison, T. & S.F. Ry. Co.,* 211 Kan. 368, 507 P.2d 353 (1973) (no illegal assignment of tort claim where in-

4. HealthOne is not seeking in this litigation to enforce the assignment language. Rather, it is seeking to enforce the contract with Wesley. Thus, the asserted illegality of the assignment language does not, in a strict sense, preclude HealthOne's claim for breach of contract. Nevertheless, the validity of the assignments directly affects HealthOne's claim for damages because HealthOne cannot recover lost profits arising from illegal and unenforceable assignments.

5. HealthOne also contends that, regardless of public policy, Wesley is estopped to deny the

validity of the contract because it accepted benefits under the agreement. Such a contention if accepted would place the court in the untenable position of enforcing an unlawful agreement. As Wesley points out, where a contract violates public policy "the aid of the Court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of the individual parties." *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 77–78, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982).

surer had interest in wrongful death action).

■■■] Notwithstanding the foregoing conclusion, HealthOne's potential recovery in this case may be limited by a separate public policy consideration. Specifically, the HealthOne assignment may be contrary to the Kansas public policy embodied in the state's hospital lien statute insofar as the assignment purports to alter the rights granted by that statute. The HealthOne assignment, which plaintiff characterizes as an alternative to a hospital lien, purports to assign to the hospital without limitation [6] "the proceeds of any judgment or settlement of any claim against any third party. . . ." Under the Kansas lien statute, a treating hospital is granted a lien in the amount of its reasonable charges upon on any sum to be recovered by the patient in a claim against another for his injuries, but the lien is fully enforceable only to the amount of $5,000, while the portion of the lien above that amount "shall only be enforceable to the extent that its enforcement constitutes an equitable distribution of any settlement or judgment." K.S.A. § 65–406(c). If the patient and hospital cannot agree upon how to divide the proceeds, the matter must be submitted to a court for determination of an equitable distribution. *Id.* Additionally, the hospital's lien "shall not in any way prejudice or interfere with any lien or contract which may be made by such patient ... with any attorney or attorneys for handling the claim on behalf of such patient. . . ." K.S.A. § 65–406(b).

Although Kansas courts have not addressed the issue, other courts have held that a hospital cannot use a prior assignment from the patient to defeat a statutory lien of the patient's attorney with respect to proceeds of a settlement or judgment against a third-party tortfeasor. *See e.g., Abbondola v. Kawecki,* 177 Misc. 122, 29 N.Y.S.2d 530 (1941); *Bey v. Motor Vehicle Acc. Indem. Corp.,* 236 N.Y.S.2d 831 (1962). *See also* "Construction, Operation and Effect of Statute Giving Hospital Lien Against Recovery From Tortfeasor Causing Patient's Injuries," 16 A.L.R.5th 262 (1993). In *North Carolina Baptist Hospitals, Inc. v. Mitchell,* 323 N.C. 528, 374 S.E.2d 844 (1988), for example, the court found that an attorney who disbursed the proceeds of a settlement in accordance with the state lien statute was not liable to a hospital that claimed a prior assignment from the patient, despite the attorney having had prior notice of the assignment. The court said the state statute provided the sole mechanism for distribution of the funds. *Id. But see Charlotte-Mecklenburg Hosp. Authority v. First of Georgia Ins. Co.,* 340 N.C. 88, 455 S.E.2d 655 (1995). Given the clear directive in K.S.A. § 65–406 that a hospital lien may not interfere with the lien of the patient's attorney on a third party liability claim, the court must conclude that any attempt by a hospital (or the patient) to pre-empt or avoid such a lien by prior assignment is likely contrary to the public policy of Kansas. Similarly, the court believes the use of an assignment executed before the proceeds are in existence to alter the statutory mechanism for distribution of the proceeds would likely be found contrary to Kansas public policy where distribution in accordance with the assignment would be inequitable.[7]

**6.** HealthOne asserts the patient only agrees to assign his right to receive money from a third party "up to the amount of the patient's contractual debt to the hospital." HealthOne Mem. at 20. In fact, the assignment states that the patient "absolutely assigns to the hospital the proceeds of any judgment or settlement of any claim against any third party .." and then states that if the hospital receives more money than the amount of the debt, it may apply the difference to any other unpaid bills of the patient to the hospital (including attorney's fees) and that the hospital will then refund any overpayment within 90 days.

**7.** A determination of what is equitable would require a consideration of all the circumstances then existing, including the amount of the settlement or judgment and the relative positions of the parties.

The foregoing public policy considerations do not entitle Wesley to summary judgment. They may, however, limit the amount of damages HealthOne can permissibly claim from the alleged breach of contract by Wesley. Inasmuch as the import of the Kansas lien law has been raised by the court, however, and the parties have not had an opportunity to brief the matter, the court will reserve ruling on this issue until the time of trial. Similarly, the court will reserve the question of whether HealthOne's claim for quantum meruit is to any degree barred by the same public policy considerations.

3. *Punitive Damages.*

 Wesley next seeks summary judgment on HealthOne's claim for punitive damages. Both sides recognize that Mississippi law permits an award of punitive damages if the defendant's conduct was so egregious that it constituted an independent tort. *See Hurst v. Southwest Miss. Legal Serv. Corp.,* 708 So.2d 1347, 1350 (Miss.1998). Wesley argues punitive damages should not be permitted here because "Wesley has a good faith dispute over the amount the Plaintiff is entitled to under the contract." Wesley Mem. at 14. HealthOne, on the other hand, argues that Wesley prevented it from performing the contract and then withheld payment in an attempt to renegotiate the contract, which "deprived Plaintiff, a small, young struggling company, of much needed funds." HealthOne Mem. at 25.

 Although punitive damages are not ordinarily recoverable in cases involving breach of contract, they are recoverable under Mississippi law where the breach results from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort. *Hurst v. Southwest Miss. Legal Serv. Corp.,* 708 So.2d 1347, 1350 (Miss. 1998). Punitive damages are allowed only with caution and within narrow limits. *Blue Cross & Blue Shield of Mississippi, Inc. v. Maas,* 516 So.2d 495, 496–97 (Miss.

1987). Before punitive damages can be recovered from a defendant, the plaintiff must prove by a preponderance of the evidence that the defendant "acted with (1) malice, or (2) gross negligence or reckless disregard for the rights of others." *Hurst,* supra (citing *Universal Life Ins. Co. v. Veasley,* 610 So.2d 290, 293 (Miss.1992)).

 HealthOne fails to specifically identify any independent tort committed by Wesley in connection with the dispute. Instead, HealthOne simply characterizes Wesley's conduct as intentional and complains of its "heavy-handed tactics." In any contract action the breaching party may be said to have acted intentionally, but that will not suffice to permit an award of punitive damages. HealthOne fails to cite any evidence that this was anything other than a good faith dispute over the contract. HealthOne complains that Wesley refused to refer cases to it after the initial dispute arose and that it failed to pay any commissions, but such actions were at most a breach of the contract entitling HealthOne to actual damages. In sum, HealthOne fails to cite any evidence of malice or of an independent tort that would justify punitive damages. *See also Atchison Casting Corp. v. Dofasco, Inc.,* 889 F.Supp. 1445, 1462 (D.Kan.1995) (rule in Kansas is that punitive damages may not be recovered in a breach of contract action even if the breach is intentional, unless the plaintiff pleads and proves an independent tortious act causing injury). As such, Wesley is entitled to summary judgment on this claim.

IV. *Defendant Columbia/HCA's Motion for Summary Judgment.*

 Although Columbia/HCA was not a party to the contract and is ostensibly a separate legal entity from Wesley, HealthOne claims Columbia/HCA controls Wesley and is liable for Wesley's actions under the "alter ego" doctrine of corporate liability. Columbia/HCA seeks summary judgment on this claim, arguing that Heal-

thOne fails to satisfy the prerequisites for piercing the corporate veil.

The parties have set forth extensive facts in their briefs concerning the degree of control allegedly exercised by Columbia/HCA over Wesley. These facts are immaterial, however, because in order to pierce the corporate veil a plaintiff must show that allowing the separateness of the corporate structures to stand would work a fraud or injustice on the plaintiff. For example, in *A & L, Inc. v. Grantham*, 747 So.2d 832, 843 (Miss.1999), the court noted that "the corporate entity may be disregarded where 'the separate personalities of the corporation and the shareholder no longer exist and adherence to the fiction of separate corporate existence would under the circumstances sanction a fraud or promote injustice....'". *See also Gray v. Edgewater Landing, Inc.*, 541 So.2d 1044, 1047 (Miss.1989) (to disregard the corporate entity requires evidence of fraud or other equivalent misfeasance); *Matter of Multiponics, Inc.*, 622 F.2d 709, 725 (5th Cir.1980) ("[W]e must remember that the alter ego doctrine and piercing of the corporate veil are truly exceptional doctrines, reserved for those cases where the officers, directors or stockholders utilized the corporate entity as a sham to perpetrate a fraud, to shun personal liability, or to encompass other truly unique situations."); *League of Kansas Municipalities v. Board of County Com'rs. of Shawnee County, Kan.*, 24 Kan.App.2d 294, 299, 944 P.2d 172, 176 (1997) (Alter ego is "used to pierce the corporate veil when a corporation is using its status as a means of injustice to some third person.").

HealthOne cites nothing to show that permitting the defendants to maintain their separate corporate structures will result in injustice. There is no evidence that HealthOne believed it was contracting with Columbia/HCA rather than Wesley, or that it will suffer injustice unless Columbia/HCA is held responsible for Wesley's actions. *Cf. Huard v. Shreveport Pirates, Inc.*, 147 F.3d 406, 409 (5th Cir.1998)

(more difficult to pierce the corporate veil in a contract action because the plaintiff chose to rely on the obligation of the corporation in entering the contract). There is no claim here by Wesley that Columbia/HCA rather than it bears responsibility for the alleged breach of contract. Nor is there evidence of any fraud perpetrated on HealthOne by Columbia/HCA. Finally, and perhaps most significantly, HealthOne cites no evidence that Wesley—with a net worth in excess of $200 million—will be incapable of paying any judgment rendered against it in this action. In sum, HealthOne fails to cite any evidence that could support a claim for liability against Columbia/HCA. Accordingly, Columbia/HCA is entitled to summary judgment on this claim.

## V. *Conclusion.*

Defendant Columbia Wesley Medical Center's Motion for Determination of Controlling Law (Doc. 162) is GRANTED to the extent set forth above;

Defendant Columbia Wesley Medical Center's Motion for Summary Judgment (Doc. 164) is GRANTED IN PART and DENIED IN PART as set forth above;

Defendant Columbia/HCA Healthcare Corporation's Motion for Summary Judgment (Doc. 160 ) is GRANTED.